**David C. SCHUERMAN and Diane E. Schuerman, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 93–203C.**

United States Court of Federal Claims.

Feb. 10, 1994.

---

Kurt M. Anderson, Bloomington, MN, for plaintiffs.

Jeri Kaylene Somers, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Alice E. Peterson, Farmers Home Administration, of counsel.

## OPINION

NETTESHEIM, Judge.

This case comes before the court after argument on defendant's motion to dismiss pursuant to RCFC 12(b)(1) and (4) and cross-motions for summary judgment. With regard to the jurisdictional challenge, the primary issue is whether an express or implied-in-fact contract exists between the Farmers Home Administration (the "FmHA") and borrowers who received guaranteed loans through the FmHA guaranteed loan program. Assuming the absence of an express or implied-in-fact contract, jurisdiction rests on whether a borrower under the FmHA guaranteed loan program qualifies as a third-party beneficiary to the FmHA's Contract of Guarantee with the lending institution directly responsible for providing the borrower credit. Existence of a contractual relationship is necessary to satisfy the jurisdictional requirements set forth in the Tucker Act, 28 U.S.C.A. § 1491(a)(1) (West Supp.1993). Assuming jurisdiction, defendant argues in its motion to dismiss, properly one for summary judgment, that plaintiffs' complaint must be dismissed for failure to state a claim upon which relief can be granted. The issue concerning this challenge hinges on whether the facts of record support a claim for breach of contract. Plaintiffs moved for breach under the Contract of Guarantee.

## FACTS

The following facts are undisputed, except where noted. Since 1977 David C. Schuerman and Diane E. Schuerman ("plaintiffs"), husband and wife, who reside in Danvers, Swift County, Minnesota, have engaged in several dealings with the FmHA, an agency of the U.S. Department of Agriculture ("Agriculture"). In 1977, plaintiffs entered into three separate loan contracts with the FmHA. Under this loan program, the FmHA advanced funds directly to plaintiffs on the condition that plaintiffs repay the funds on an agreed-upon schedule and in accordance with specified requirements.

On September 12, 1985, in accordance with Agriculture's Debt Set Aside program, the FmHA rescheduled the direct loans.[1] The Set Aside program further required that the FmHA take a lien on all of plaintiffs' assets, including chattels. According to the regulations, all individuals with FmHA loans secured by chattels must ensure that the FmHA, at all times, possesses a current Form FmHA 1962–1 ("Form 1962–1"). *See* 7 C.F.R. § 1962.17(a)(2) (1993) (stating that "[s]ection 1924.57 ... requires that there must always be a current Form FmHA 1962–1 in the file of a borrower with a loan secured by chattels....").

In addition to the direct loan program, the FmHA offers a guaranteed loan program, whereby the FmHA guarantees loans made by authorized lenders to individual farmers, such as plaintiffs. One of the primary purposes of this program is to assist farmers in obtaining necessary operating credit. Interested in securing additional funds, plaintiffs applied for a line of credit in the amount of $158,000.00 under the guaranteed loan program. The parties dispute the actual destination of plaintiffs' application. Plaintiffs argue that they sent their application directly to the FmHA; defendant claims that plaintiffs applied directly to the Production Credit Association (the "PCA"),[2] a lending institu-

tion participating in the FmHA guarantee program. According to defendant, upon receipt of plaintiffs' application, PCA then submitted various loan documents to the FmHA, requesting a guarantee for the line of credit for which plaintiffs had applied.

Upon receiving certification from the FmHA County Committee that plaintiffs qualified as eligible candidates for the guarantee, the FmHA sent PCA a copy of Form FmHA 1980–15, the Conditional Commitment for Contract of Guarantee ("Conditional Commitment"), which listed the conditions under which the FmHA would guarantee PCA the requested line of credit. In addition to the requirements specified on the standard Form FmHA 1980–15, the FmHA required that plaintiffs' loan payments first be applied to the guaranteed crop and chattel loans and then, in descending order, applied to the FmHA, Agricultural Stabilization and Conservation Service ("ASCS"), the contract for deed, Danvers State bank, and finally unsecured creditors. The FmHA also required PCA to condition the advancement of funds for each year of the guarantee on whether plaintiffs had paid the installments due on their direct loans. *See supra* note 1.

The validity of the Conditional Commitment hinged on the acceptance of the terms contained therein by both borrower plaintiffs and lender PCA within 60 days of the date on which the FmHA issued the document. According to plaintiff David Schuerman's declaration, he "reviewed the Conditional Commitment for Contract Guarant[ee], agreed to accept the terms of the Conditional Commitment and authorized PCA to accept the Conditional Commitment on ... [his] behalf." Declaration of David C. Schuerman, dated Oct. 14, 1993, ¶ 3. PCA signed the Conditional Commitment on April 18, 1986, and forwarded the document to the FmHA.

Plaintiffs next entered into a loan agreement with PCA. On June 4, 1986, upon

---

1. The rescheduled loans included Loan No. 29–06 in the amount of $134,615.46; Loan No. 43–07 in the amount of $66,628.42; and Loan No. 43–08 in the amount of $216,743.45. As of September 20, 1993, plaintiffs owed the FmHA $645,830.73 for these direct loans. This figure, however, includes a payment of $83,795.59 made

by the FmHA to preserve its right to collection on the loans after deed cancellation proceedings were initiated against plaintiffs.

2. The PCA is also commonly referred to as Farm Credit Services.

closure of the loan transaction, the FmHA completed and signed the Contract of Guarantee and submitted the document to PCA. The Contract of Guarantee extended a line of credit in the amount of $158,000.00 to be issued over a three-year period extending from 1986 through 1988. The extension of this credit forms the basis of plaintiffs' complaint.

On January 14, 1987, according to defendant, plaintiffs and the FmHA signed the 1986 Form 1962–1 to ensure compliance with FmHA rules governing plaintiffs' direct loans secured by chattels.[3] In March 1987 the parties came into conflict regarding a new Form 1962–1. Specifically, plaintiffs objected to the FmHA's attempts to retain as collateral a 1987 advance deficiency payment from Agriculture's ASCS. Plaintiffs staunchly defended their position and refused to execute the new Form 1962–1. Plaintiffs also refused to sign the related Farm and Home Plan for 1987 until the parties reached a resolution regarding Form 1962–1. In June 1987 the FmHA finalized Form 1962–1, including the ASCS as collateral. In an administrative proceeding, plaintiffs appealed this action and on January 12, 1988, the State Director ultimately held for plaintiffs, requiring the FmHA to exclude the ASCS payment from Form 1962–1.[4]

Prior to the Board's decision in 1988, PCA informed plaintiffs of several deficiencies associated with their $158,000.00 guaranteed loan; these deficiencies, however, were separate and independent from the Form 1962–1 controversy associated with plaintiffs' direct loans. In a letter dated February 20, 1987, to the FmHA, PCA expressed concern regarding plaintiffs' direct loan deficiencies, payment of which, according to PCA, was pertinent to the guarantee.[5] This letter requested information concerning the arrangements the FmHA had made with plaintiffs regarding the deficiencies. The letter further stated that "we, [PCA], need to ... settle[ ] [those payments] prior to consider-

ing [whether to] advance[ ] on the 1987 line of credit guarantee."

In a letter dated June 16, 1987, PCA informed plaintiffs' attorney that plaintiffs both owed in excess of $32,000.00 on direct loans to the FmHA and apparently had omitted necessary creditor information from required financial forms. PCA also expressed a general concern that, throughout the guarantee process plaintiffs, "may not have been disclosing all the facts to the PCA or FmHA." The letter further indicated that the FmHA already had approached plaintiffs regarding their delinquent direct loan payments. Plaintiffs do not dispute the direct loan delinquency.

About one week later, in a letter dated June 24, 1987, Stuart E. Shelstad, County Supervisor, informed PCA that "it appears that Farm Credit Services [or PCA] needs to make a loan servicing decision as to whether or not to extend [plaintiffs'] credit for 1987." In addition to this statement, the letter mentioned the controversial Form 1962–1, which plaintiffs had refused to sign. On July 2, 1987, Mr. Shelstad again wrote to PCA informing it that "[b]ased on the Conditional Commitment for the Line of Credit Guarantee, it appears that Farm Credit Services [or PCA] would be unable to forward credit [to plaintiffs] for 1987 *due to the FmHA delinquency* . . . ." (emphasis added). The letter further stated absent accurate, verifiable financial information, "it would not be a good lending practice to forward credit . . . ." The letter closed with a request for plaintiffs' most recent financial statement.

According to defendant, after consideration of the Conditional Commitment and the erroneous financial information submitted by plaintiffs, PCA informed the "FmHA of its desire to terminate the Contract for [sic] Guarantee by way of Form FmHA 1980–41, a Guaranteed Loan Status Report." Def's Br. filed Sept. 24, 1993, ¶ 14 (citation omitted). This form reflected that the loan was

---

3. Plaintiffs dispute that Form 1962–1 covered only the 1986 fiscal year and instead argue that the Form was designed to apply from December 1986 through October 1987.

4. Defendant denies that plaintiffs prevailed in their appeal because plaintiffs never signed Form 1962–1, even after the State Director required the modification regarding the ASCS issue.

5. Plaintiffs received a copy of this letter.

closed in full on [illegible] 20, 1988, "[d]ue to lack of repayment." *Id.* Defendant argues that because PCA initiated the termination of the Contract of Guarantee, the FmHA's duty under the regulations to notify the parties of an adverse action and inform them of their appeal rights was not invoked.

Plaintiffs dispute defendant's characterization of the events. According to plaintiffs, the FmHA withdrew the Line of Credit Guarantee only because of the disputed Form 1962–1 and for no other reason. To support this position, plaintiffs reference the letter dated April 6, 1987, from Mr. James P. Neely, Assistant County Supervisor, to plaintiffs. The letter, although quite terse, stated that "no money ... [would] be advanced under the Guarantee Line of Credit from PCA without ... [plaintiffs'] cooperation regarding the Farm and Home Plan and 1962–1...." The letter also stated that both forms must be signed to remain in compliance with FmHA policies. Plaintiffs further assert that PCA did not advance operating funds for 1987, or any of the following years even after the Form 1962–1 dispute was resolved in plaintiffs' favor via the administrative appeal process.

Claiming breach of contract, plaintiffs filed suit in the United States Court of Federal Claims on April 6, 1993, seeking lost profits and other damages in an amount exceeding $500,000.00. Plaintiffs also request attorneys' fees and other costs.

## DISCUSSION

### 1. *Motion to dismiss*

■ When evaluating a motion to dismiss for lack of subject matter jurisdiction, the allegations of the complaint should be construed favorably to the pleader, *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), to the end that the court must accept as true the facts alleged in the complaint. *See also Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988), *W.R. Cooper General Contractor, Inc. v. United States,* 843 F.2d

1362, 1364 (Fed.Cir.1988). The central issue in evaluating such a motion "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims...." *Scheuer,* 416 U.S. at 236, 94 S.Ct. at 1686.

■ Plaintiffs bear the burden of establishing jurisdiction. *Reynolds,* 846 F.2d at 748 (citing cases). Dismissal is appropriate only if "it is beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir.1989) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). For purposes of passing on a motion to dismiss pursuant to RCFC 12(b)(1), the court is not confined to an examination of the complaint. Instead, the court may consider "evidentiary matters outside the pleadings." *Cedars–Sinai Medical Center v. Watkins,* 11 F.3d 1573, 1583–84 (Fed.Cir.1993); *Indium Corp. of America v. Semi–Alloys, Inc.,* 781 F.2d 879, 884 (Fed.Cir.1985), *cert. denied,* 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986) (citations omitted).

### 2. *Privity*

■ The Tucker Act, 28 U.S.C.A. § 1491(a)(1), authorizes the Court of Federal Claims to assume jurisdiction over certain suits against the sovereign. Specifically, the Act affords jurisdiction where privity of contract exists between the party bringing suit and the United States, *i.e.,* where the claim is based upon an express or implied contract. *Erickson Air Crane Co. v. United States,* 731 F.2d 810, 813 (Fed.Cir.1984); *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1550 (Fed.Cir.1983).

Defendant argues that plaintiffs have not alleged facts sufficient to establish privity of contract between the parties. Plaintiffs rejoin that "[t]he contract of guarantee alone, or the documents read together, constitute a three-party express contract that included FmHA and the Schuermans."[6] Plfs' Br. filed Oct. 26, 1993, at 9. In the alternative,

---

6. Although plaintiffs do not elaborate as to which documents, read together, constitute a contract, plaintiffs appear to be referencing the Conditional Commitment, the loan application, and the FmHA County Committee Certification.

plaintiffs argue that the documents pertaining to the guarantee, if read together, constitute an implied-in-fact contract.

■ To establish the existence of either an express or implied-in-fact contract, plaintiffs must prove: "mutuality of intent, lack of ambiguity in offer and acceptance, and consideration." *Commonwealth of Ky. v. United States*, 27 Fed.Cl. 173, 176 (1992) (citing *Fincke v. United States*, 230 Ct.Cl. 233, 243–44, 675 F.2d 289, 295 (1982)); *see Ysasi v. Rivkind*, 856 F.2d 1520, 1525 (Fed.Cir.1988) (holding establishment of implied-in-fact contract requires proof of the same elements required for a showing of an express contract). Moreover, the facts and circumstances must demonstrate that the parties to the contract "have taken upon themselves corresponding obligations and liabilities and have come to a meeting of [the] minds." *Commonwealth of Ky.*, 27 Fed.Cl. at 176 (citing *Porter v. United States*, 204 Ct.Cl. 355, 365, 496 F.2d 583, 590 (1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975)).

■ Plaintiffs' argument that the Contract of Guarantee alone constitutes an express contract fails because plaintiffs have not established privity of contract. The court in *Parker v. United States Department of Agriculture*, 879 F.2d 1362 (6th Cir.1989), addressed the issue of privity with respect to a borrower under the FmHA guarantee program. Specifically, the court noted:

> Once FmHA grants the guarantee, a contractual relationship between FmHA (guarantor) and the lender (guarantee) is created. FmHA approves the lender's request for a guarantee in consideration for the lender's promise to approve the borrower's loan and advance the funds requested. *There is no privity of contract between the borrower and FmHA*, and the *borrower provides no consideration* [to FmHA]. The borrower is only a party to the contract with the lender; and exchanges a promise to repay the loan at some date in the future for the lender's promise to approve the loan. This promise is between the borrower and the lender and not FmHA. Additionally, the lender is not an agent of FmHA nor is the lender

permitted to act as the agent or representative of FmHA. The funds advanced are those of the lender and not FmHA....

*Id.* at 1364 (emphasis added).

Although *Parker* is not binding authority, the Sixth Circuit correctly noted that the sole parties to a Contract of Guarantee are the FmHA and the lending institution, which in this case is PCA. Plaintiffs were neither signatories nor parties to the Contract of Guarantee. In addition, the record reveals no evidence of a meeting of the minds between plaintiffs and the FmHA. First, the contract begins with the statement that "the United States of America acting through the Farmers Home Administration ... agrees that ... it will pay ... the *Lender* ... for said advance(s)...." (Emphasis added.) This language unmistakably indicates an intent to pay the lender, not plaintiffs. Second, the last sentence of the contract indicates that the "Contract for Guarantee [sic] is issued under the *Lender's Agreement for Operating Line of Credit Guarantee* dated October 28, 1985." (Emphasis added.) Only qualified lenders, as defined in 7 C.F.R. § 1980.13(b) (1993), may enter into direct contractual guarantee arrangements with the FmHA. Thus, plaintiffs could never qualify as direct parties to the Contract of Guarantee.

Finally, the contractual obligations pertaining to the guarantee ran only between the FmHA and PCA, as evidenced by the fact that the terms of the Contract of Guarantee refer only to the lender's duties and responsibilities. The contract specifically states that the "Lender will be responsible for servicing the entire line of credit ...;" "[p]rotective advances made by [the] Lender will be guaranteed ...;" and, finally, "[t]he Lender may retain or sell the unguaranteed portion of the line of credit...."

Plaintiffs' assertion that the loan documents pertaining to the guarantee, read together, create a three-party express or implied-in-fact contract also lacks merit. Plaintiffs neither cite any authority for such a proposition, nor do they establish the requisite contractual elements, such as consideration. *See Parker*, 879 F.2d at 1364 (stating

that the borrower contracts only with the lender and provides no consideration to the FmHA). Plaintiffs argue that the consideration they provided to PCA by signing the promissory note and rendering the security agreement supports their claim of an express or implied-in-fact contract with the Government, because "consideration can be given to a third party." Plfs' Br. filed Oct. 19, 1993, at 9 (citing *John Deere Co. v. Broomfield,* 803 F.2d 408, 410 (8th Cir.1986)) (citation omitted). *John Deere,* however, stands only for the proposition that a payment made to a third party at the promisor's request constitutes consideration between the promisor and the entity that paid the third party, not consideration between the promisor and the third party.

In this case the FmHA approved PCA's request for the guarantee of plaintiffs' operating line of credit. In consideration for this promise, PCA agreed to pay a third party—plaintiffs. This fact establishes only that consideration existed to support the contract between the FmHA and PCA, not that consideration existed to support a contract between the FmHA and plaintiffs. The only other consideration in this case concerns, as plaintiffs have appropriately noted, the promise made by plaintiffs to satisfy the terms of the promissory note in return for the cash loaned by PCA. This consideration relates only to the loan agreement between the plaintiffs and PCA.

Plaintiffs also attempt to support their express and implied-in-fact contract claims by relying upon FmHA regulations which, according to plaintiffs, indicate that they "have a legally cognizable interest in the contract." Plfs' Br. filed Oct. 19, 1993, at 3. Plaintiffs focus on the fact that the regulations apply both to borrowers and lenders and bestow certain rights upon each party. *See* 7 C.F.R. §§ 1980.1, 1980.80, 1980.113 (1993). These regulations, by themselves, however, do not create an express or implied-in-fact contract. Plaintiffs cannot ignore the well-established privity of contract requirement by simply referencing regulations that discuss both the borrower and lender, two parties to the guarantee transaction in the instant case.

In essence, plaintiffs' arguments regarding the express and implied contract claims hinge on the fact that the Contract of Guarantee had an impact upon plaintiffs. This fact alone cannot satisfy the strict requirements necessary to demonstrate the existence of an express or implied-in-fact contract. Although it is relevant that the contract impacted plaintiffs, this fact bears relevance only to plaintiffs' third-party beneficiary claim, not to plaintiffs' claim of an express or implied-in-fact contract.

### 3. *Third-party beneficiary*

As an alternative to the express and implied-in-fact contract theories, plaintiffs argue that they qualify as third-party beneficiaries to the Contract of Guarantee. *See Robo Wash, Inc. v. United States,* 223 Ct.Cl. 693, 697–98, 1980 WL 13154 (1980) (upholding jurisdiction over claims brought by third-party beneficiaries); *Bogart v. United States,* 209 Ct.Cl. 208, 214, 531 F.2d 988, 991 (1976) (same); *Hebah v. United States,* 192 Ct.Cl. 785, 791, 428 F.2d 1334, 1339 (1970) (same). A common judicial comment has been that "[t]hird party beneficiary law has been plagued by uncertainties, doctrinal and conceptual difficulties, and confusion...." *Ables v. United States,* 2 Cl.Ct. 494, 499 (1983), *aff'd mem,* 732 F.2d 166 (Fed.Cir. 1984). The decisional law generated by the Claims Court over the past ten years, as explained below, accurately reflects this characterization.

Defendant rejects plaintiffs' claim that they are third-party beneficiaries to the Contract of Guarantee, arguing that plaintiffs cannot meet the two-prong third-party beneficiary test, first enunciated by the Claims Court in *Baudier Marine Electronics, Sales and Service, Inc. v. United States,* 6 Cl.Ct. 246, 249 (1984), *aff'd mem.,* 765 F.2d 163 (Fed.Cir.1985) (citations omitted).[7] The first prong of *Baudier* requires a showing that the

---

**7.** The *Baudier* court specifically stated:
To entitle one to sue as a third-party beneficiary of a contract to which he is not a party, the contract must reflect the intent not merely to benefit the third-party *but also to give him the direct right to compensation or to enforce that right against the promisor.*
6 Cl.Ct. at 249 (emphasis added).

parties expressly or impliedly intended that the contract in question specifically benefit the party claiming third-party beneficiary status. The second prong requires that "[t]he contract must reflect the intention of the parties to give the claimant 'the direct right to compensation or to enforce that right against the promisor.'" *Blaze Constr., Inc. v. United States*, 27 Fed.Cl. 646, 652 (1993) (citing *Baudier*, 6 Cl.Ct. at 249)).

In specifying this two-part test, the *Baudier* court cited the following authorities: *German Alliance Insurance Co. v. Home Water Supply Co.*, 226 U.S. 220, 230, 33 S.Ct. 32, 35, 57 L.Ed. 195 (1912); *Robo Wash*, 223 Ct.Cl. at 697–98; *Orchards v. United States*, 4 Cl. Ct. 601, 609–12, aff'd, 749 F.2d 1571 (Fed.Cir. 1984), cert. denied, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985); and 4 Arthur L. Corbin, *Corbin on Contracts* § 775 (1951). These authorities support the first prong of the third-party beneficiary inquiry. The following analysis, however, reveals that the second prong of *Baudier* consistently has been misapplied and without analysis has been accepted by the Claims Court and the Court of Federal Claims. The second prong of *Baudier* may be applicable in certain limited circumstances, but the court improvidently adopted this requirement as a per se rule to be employed in all third-party beneficiary cases. The obvious result of this misapplication of third-party beneficiary law has been the constriction of jurisdiction without a reason in law or binding precedent to justify it.

The precedent cited by *Baudier* is a useful starting point to examine the legal validity of the second prong of the oft-cited *Baudier* test.[8] The Supreme Court in *German Alliance* held only that "[b]efore a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement, to which he is not a party, he must, at least show that it was *intended for his direct benefit . . . .*" *German Alliance*, 226 U.S. at 230, 33 S.Ct. at 35 (emphasis added). This case involved a municipal contract between the city of Spar-

tanburg and a water company to furnish adequate water supplies and pressure for city hydrants. Plaintiff, an insurance company acting as assignee of the owner of several houses, sought to sue as a third-party beneficiary to the city's contract on the grounds that the water company did not satisfy its contractual obligation to supply water, which resulted in plaintiffs sustaining severe losses caused by a fire on the insured's premises.

The Court in *German Alliance* denied plaintiff's claim as a third-party beneficiary to the contract because although the city entered the contract "for the benefit of the inhabitants collectively," *id.* at 231, 33 S.Ct. at 35, such benefit was both indirect and incidental. The Court further held that allowing plaintiff's breach of contract claim "would unduly extend contract liability." *Id.* In cases of contracts intended to benefit the general public, a stranger to such contract must show that the contract "was intended for his direct benefit." *Id.* at 230, 33 S.Ct. at 35. This holding undeniably supports the first prong of *Baudier* because it requires a showing that the contract in question was intended to specifically benefit the party claiming third-party beneficiary status. The purpose of this rule is to avoid suit for breach by incidental beneficiaries to the contract.

*Orchards*, also cited by *Baudier*, involved a situation analogous to *German Alliance*. In *Orchards* the Government entered into a contract for the benefit of the inhabitants collectively, as was the case in *German Alliance*. Specifically, the United States Bureau of Reclamation had established contracts with various irrigation districts by which the Bureau had agreed to deliver water to the districts. The method of determining water allocation among the districts was based upon a Consent Decree issued by a federal district court. Plaintiffs, farmers who were members of one of the irrigation districts, asserted that the Bureau had breached a contractual duty to provide accurate water

---

8. The following cases cite or rely upon the second prong of *Baudier*: *Blaze Constr.*, 27 Fed.Cl. at 652; *Erikson v. United States*, 12 Cl.Ct. 754, 757 (1987); *Johnson Controls, Inc. v. United States*, 8 Cl.Ct. 359, 370–71 (1985), aff'd mem., 795 F.2d 1011 (Fed.Cir.1986); *Brannan v. United States*, 7 Cl.Ct. 399, 404 (1985). These cases, however, provide no additional support for the second prong other than citing *Baudier* and the precedent cited therein. This court was responsible for *Johnson Controls* and takes occasion now to reexamine its reliance on *Baudier*.

supply projections. The *Orchards* court denied plaintiffs' relief, holding that plaintiffs failed to qualify as third-party beneficiaries because neither party to the contract intended that a specific individual of the irrigation district could maintain an action for breach.

In denying plaintiffs third-party beneficiary status, *Orchards* focused upon the fact that plaintiffs were only incidental and indirect beneficiaries of the contract and that the contract was made for the benefit of the inhabitants of the irrigation districts collectively. To avoid "subject[ing] the United States to the cost of defending multitudinous individual suits of varying natures," *Orchards,* 4 Cl.Ct. at 613, the court indicated that individual members of the public can only enforce such a broad-based benefit government contract when "the contract ... manifests the specific intent to give the individual an enforceable right to compensation for its breach that he may sue thereon." *Id.* at 610. To support this rule, the court cited *German Alliance* and section 313(2) of the Restatement (Second) of Contracts (1981) ("Restatement"). Section 313(2) specifically states that

> a promisor who contracts with a government or governmental agency to do an act for or render a service *to the public* is not subject to contractual liability to a *member of the public* for consequential damages resulting from performance or failure to perform unless
>
> (a) *the terms of the promise provide for such liability;* or
>
> (b) the promisee is subject to liability to the member of the public for the damages and a direct action against the promisor is consistent *with the terms of the contract* and with the policy of the law authorizing the contract and prescribing remedies for its breach.
>
> Comment:
>
> a. *Rationale.* * * * Government contracts often benefit the public, but *individual members of the public are treated as incidental beneficiaries unless a different intention is manifested....*

(Emphasis added.)

*Orchards* expanded the holding in *German Alliance,* which simply stated that for a

stranger to a contract to sue for a breach of contract, he must demonstrate that the contract "was *intended for his direct benefit." German Alliance,* 226 U.S. at 230, 33 S.Ct. at 35 (emphasis added). The expansion, as derived from section 313 of the Restatement, requires direct evidence in the contract that the contracting parties intended to give the third party an enforceable right to sue. Such a requirement addresses the general concern of *German Alliance,* which principally was to avoid multitudinous suits against the Government concerning for breach of a contract that was intended to benefit the public at large, as opposed to a specific individual. *See also Berberich v. United States,* 5 Cl.Ct. 652, 656 (1984), *aff'd mem,* 770 F.2d 179 (Fed.Cir.1985) (holding in cases where contract benefits general inhabitants of town, plaintiffs cannot sue for breach where contractual instruments do not include provision specifically identifying plaintiffs as express beneficiaries of contract).

The *Baudier* court apparently relied upon *Orchards* in formulating the second prong of its third-party beneficiary test. As previously noted, the second prong of *Baudier* requires that "[t]he contract must reflect the intention of the parties to give the claimant 'the direct right to compensation or to enforce that right against the promisor.'" *Blaze Constr.,* 27 Fed.Cl. at 652 (quoting *Baudier,* 6 Cl.Ct. at 249)). This requirement mimics section 313 of the Restatement. Reliance on this section of the Restatement, however, was inappropriate. The scope of section 313 is limited and applies only to suits for consequential damages against "*promisor[s] who contract with a government* or governmental agency ... [to] render a service to the public." (Emphasis added.)

Moreover, the policy rationale supporting section 313 of the Restatement pertains only to cases involving general government contracts that are intended to benefit the community as a whole, as opposed to a specific individual. *Baudier* did not involve a situation where a random member of the general public who allegedly indirectly benefitted from a general government contract sought to sue for breach of contract. Instead, *Bau-*

*dier* involved a contract awarded by the Army Corps of Engineers ("Corps") to a prime contractor for certain dredging operations. Several subcontractors sued the Government alleging third-party beneficiary status, claiming that the Corps erroneously failed to properly verify the prime contractor's surety company. Despite this important factual difference, the *Baudier* court cited *Orchards* for the proposition that a party could not claim third-party beneficiary status unless he established that the contract reflected the intent of the original contracting parties to give the subcontractors "the direct right to compensation or to enforce that right against the promisor."[9] *Baudier,* 6 Cl.Ct. at 249.

The final case relied upon by the *Baudier* court to support its two-prong test, *Robo Wash,* 223 Ct.Cl. 693, involved a contract between the Small Business Administration and Midwest Cabinet Manufacturing corporation, where Robo Wash served as the guarantor for the loan. Two employees of Robo Wash brought suit individually as employees and shareholders, alleging breach of the guarantee contract. Relying on *German Alliance,* the court held that plaintiffs, as employees, must establish that the contract was intended for their direct benefit. The court specifically noted that plaintiffs failed to demonstrate that the agreement in any way conferred benefits upon them, as employees, and therefore they could not claim third-party beneficiary status. Thus, the court focused upon only the first prong of the *Baudier* third-party beneficiary test, *i.e.,* whether the contract was intended for the direct benefit of the claimed third-party beneficiary.

Although, the three cases relied upon by *Baudier* support the first prong of the third-party beneficiary test, the only case that remotely supports the second prong is *Orchards;* that decision relies upon a section of the Restatement having limited applicability. It is noteworthy that the Federal Circuit, although affirming the holding of the Claims

Court in *Orchards,* disagreed with the Claims Court's determination that plaintiffs were not third-party beneficiaries to the Consent Decree. The court emphasized that the irrigation districts used no water themselves and that plaintiffs, the farmers, ultimately paid for the water services provided by the Government. Thus, the appeals court held that plaintiffs, having a property right in the water, qualified as the intended third-party beneficiaries of the Consent Decree. In disagreeing with the Claims Court's determination concerning plaintiffs' status, the Federal Circuit did not comment on the validity of the third-party beneficiary tests employed by the court, as delineated above.

Assuming that the Federal Circuit impliedly affirmed the third-party beneficiary tests employed by the Claims Court and disagreed only with the application of these tests, the requirement in *Orchards* that there be direct evidence in the contract that the contracting parties intended to give the third party an enforceable right to sue for compensation again applies only in limited circumstances. This requirement, although relevant in cases of general government contracts benefitting the public at large, is inapposite in other contexts involving putative third-party beneficiaries. For purposes of determining whether a party qualifies as a third-party beneficiary, a court should focus its inquiry upon only the first prong of the *Baudier* inquiry. A court should examine whether the contract in question was intended specifically to benefit the party claiming third-party beneficiary status.

Finally, to support the second prong of its third-party beneficiary test, the *Baudier* court cited 4 *Corbin on Contracts* § 775. This section, however, is void of any mention of a requirement such as the second prong of *Baudier, i.e.,* that the contract reflects that the parties intended to give the third party "the direct right to compensation or to enforce that right against the promisor." *Baudier,* 6 Cl.Ct. at 249. Plaintiffs noted one

9. This court does not imply that subcontractors qualify as third-party beneficiaries to contracts between the United States and prime contractors. It is well-established that subcontractors do not have privity of contract with the Govern-

ment. *Johnson Controls,* 713 F.2d at 1551. This proposition was established before the second prong of the *Baudier* third-party beneficiary test sprang into being.

portion of section 775, which the *Baudier* court may have misinterpreted. Plaintiffs cite:

> The right of a third party beneficiary rests chiefly upon the fact that the contract will create reasonable expectations on his part and will induce him to change his position in reliance. But it rests also upon the fact that permitting enforcement by the beneficiary will carry out the intentions and satisfy the expectations of the promisee with the least amount of litigation....

4 *Corbin on Contracts* § 775. This passage supports only the first prong of the third-party beneficiary test. It does not require that the contract itself include an express provision, or that an inference could be made from the language of the contract, whereby the third-party beneficiary may sue for compensation or enforcement.

The Restatement further supports employing only the first prong of *Baudier* to evaluate a third-party beneficiary claim. Section 302 of the Restatement echoes the distinction articulated by the court in *German Alliance* and *Robo Wash* and notes that only intended, or direct, beneficiaries of a contract may sue thereon.[10] According to section 302, a party is an intended beneficiary if recognizing such a right is consistent with the parties' intent "and either ... the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary or ... the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."

Section 304 further provides that "[a] promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty." As the Comment to this section states, "a duty to an intended beneficiary is created if the promise is otherwise binding...." Thus, under the Restatement, once a party claiming to be a third-party beneficiary establishes that he qualifies as an intended beneficiary of an enforceable, or otherwise valid, contract, section 304 directs that the promisor must perform the promise as stipulated or risk suit by the third-party beneficiary.

In addition to the Restatement, several other cases, which deal with third-party beneficiary claims, have addressed only the first prong of the *Baudier* inquiry. For example, in one of the original third-party beneficiary cases heard by the Claims Court, the court cited the test for determining the appropriateness of such claims as "whether the agreement at issue intended to benefit the third party." *Ables*, 2 Cl.Ct. at 499 (citation omitted). As the *Ables* court noted, "This intent to benefit test has been utilized by the United States Court of Claims in third party beneficiary suits...." *Id.* The exact test employed by the Court of Claims was whether the claimant could "'show that ... [the contract] was intended for his direct benefit.'" *Id.* at 500 (citing *Robo Wash*, 223 Ct.Cl. at 697–98; *German Alliance*, 226 U.S. at 230, 33 S.Ct. at 35); *see also Hebah*, 192 Ct.Cl. at 791, 428 F.2d at 1339 (holding third-party beneficiary relationship exists where performance of promise will benefit person other than promisee).

*Ables*, in characterizing the law regarding third-party beneficiary claims, did not reference any provision resembling the second prong of *Baudier*. In applying the intent-to-benefit test, the *Ables* court examined the primary purpose of the agreement between the parties and determined that the purpose did not contemplate benefiting parties such as the plaintiff.[11] This case is noteworthy

---

**10.** Section 302 states:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; *or*

> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.
> (Emphasis added).

**11.** *Ables* involved an agreement between a union and the Air Force, the purpose of which was to resolve certain disputed issues. The court stated that "[w]hile the agreement contemplated the use of arbitrators to further realization of their

because it properly characterizes the relevant inquiry for purposes of third-party beneficiary claims and correctly cites the Court of Claims' precedent.

In addition to *Ables*, several other Claims Court decisions regarding third-party beneficiary status have declined to mention the second requirement set forth in *Baudier*. *See Miles Farm Supply, Inc. v. United States*, 14 Cl.Ct. 753, 758 (1988) (holding that plaintiff must establish that "it was the express or implied intention of th[e] parties to benefit ... [him]....") (citing *Metzger, Shadyac & Schwarz v. United States*, 12 Cl.Ct. 602, 605 (1987)); *Penn Towne Builders, Inc. v. United States*, 4 Cl.Ct. 677, 682 (1984) (ruling that plaintiff must demonstrate that it was "the express or implied intention of any of the ... parties to the agreements ... to benefit plaintiff"). In *Busby School of Northern Cheyenne Tribe v. United States*, 8 Cl.Ct. 596 (1985), the court again recited that the general test for third-party beneficiary claims is whether plaintiffs can show that they were the intended beneficiaries of the contracts at issue. *Id.* at 602 (citing *Ables*, 2 Cl.Ct. at 500). The court did not state that the contract in question itself must reflect the intention of the parties to give the claimant "the direct right to compensation or to enforce that right against the promisor." *Baudier*, 6 Cl.Ct. at 249.

*Busby School* involved a contract between a School Board and the Bureau of Indian Affairs (the "BIA"), which provided that any repairs and maintenance to the school will be the responsibility of the BIA, unless otherwise agreed to by the parties. Failure of the BIA to address the maintenance needs of the school resulted in the high school facility being closed. Plaintiffs in this case include two named families consisting of three adults and five minor children, who sued as third-party beneficiaries to the BIA's contract with the School Board. The court denied defendant's motion to dismiss the third-party beneficiary claim because the purpose of both the underlying policy of the contract and the relevant regulations and statutes was to provide Indian children with an education. Moreover, the court found that "[t]he contracts in issue incorporated therein the substance and intendment of the[ ] statutes." *Busby School*, 8 Cl.Ct. at 602 (citation omitted); *see also Filmtec Corp. v. Hydranautics*, 982 F.2d 1546, 1550–51 (Fed.Cir.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 85, 126 L.Ed.2d 53 (1993) (relying on language of statute under which contract was let to determine whether defendant qualified as third-party beneficiary). Moreover, the court emphasized that because the contract included a provision whereby the BIA would repair the school, plaintiffs appeared to qualify as the intended beneficiaries of the contract, given that the closing of the school adversely affected plaintiffs.

Based on this precedent, the court cannot discern any reasoned legal support for the second prong of the third-party beneficiary test relied upon by the Government in this case and originally cited in *Baudier*. The only support for this requirement derives from the repeated citations to *Baudier*.[12] *See supra* note 7. In fact, defendant concedes that "[a]lthough the[ ] ... cases [cited by *Baudier*] did not emphasize the second prong of the third-party beneficiary test, subsequent decisions by this Court [the Claims Court and Court of Federal Claims], have uniformly embraced and applied an intent requirement for third-party beneficiary recovery." Def's Br. filed Dec. 30, 1993, at 2 n. 1.[13] Although it is fair advocacy for defen-

---

primary purpose, the agreement was not entered into for the primary purpose, of benefiting the arbitrators, including plaintiff." 2 Cl.Ct. at 500.

**12.** *See also Clean Giant, Inc. v. United States*, 19 Cl.Ct. 390, 394 (1990) (denying plaintiff's third-party beneficiary claim because of failure to cite contract provision "which would ... allow plaintiff to enforce any rights against defendant"); *Sharkey v. United States*, 17 Cl.Ct. 643, 653 (1989) (same).

**13.** Defendant further supports the validity of the second prong of *Baudier* by citing *Montana Bank of Circle, N.A. v. United States*, 7 Cl.Ct. 601 (1985), which stated that "[t]here must be a showing of an intent that the promisor shall assume a direct obligation to the third party." 7 Cl.Ct. at 611 (citations omitted). The *Montana Bank* court supported this proposition by citing two state cases, *McDonald Construction Co. v. Murray*, 5 Wash.App. 68, 485 P.2d 626 (1971); *Vikingstad v. Baggott*, 46 Wash.2d 494, 282 P.2d

dant to urge adoption of a rule of law that restricts the court's jurisdiction, defendant would avoid prolonged briefing (as in this case) by candidly stating that it seeks to extend the law when it first makes an argument of this nature.

The proper test for determining third-party beneficiary status is whether the contract reflects the express or implied intention of the parties to benefit the third party, *i.e.*, the first prong of the test set forth in *Baudier. See German Alliance*, 226 U.S. at 230, 33 S.Ct. at 35 (holding contract at issue must be intended for the direct benefit of the third party); *Robo Wash*, 223 Ct.Cl. at 697–98 (same); *Hebah*, 192 Ct.Cl. at 791, 428 F.2d at 1339 (same); *Ables*, 2 Cl.Ct. at 500 (same). This test is commonly referred to as the intention-to-benefit test. Evaluating plaintiffs' claim as third-party beneficiaries to the Contract of Guarantee requires the court to examine whether plaintiffs have demonstrated that the contracting parties, the FmHA and PCA, expressly or impliedly intended the contract to benefit them. The court carefully must distinguish between incidental and indirect beneficiaries and direct beneficiaries, only the latter of which qualifies for third-party beneficiary status.

In both its moving and supplemental briefs, dated September 24, November 4, and December 30, 1993, respectively, defendant focuses only upon plaintiffs' failure to satisfy the second prong of the third-party beneficiary test set forth in *Baudier.* Defendant notes that the contract does not reflect the intention of the FmHA and PCA to confer the direct right to sue the United States. Defendant, however, does not deny that plaintiffs have satisfied the first prong of *Baudier*, which requires only that the contract be intended for the direct benefit of plaintiffs. In fact, defendant conceded in the initial pleadings that the FmHA entered into the Contract of Guarantee for the specific benefit of plaintiffs and no one else, because such guarantee would allow plaintiffs to obtain the necessary operating credit to continue their farming operations. *See* Compl. filed Apr. 6, 1993, ¶ 17; Ans. filed June 7,

1993, ¶ 17. Such a concession is wholly appropriate in light of the regulations governing the guarantee program. *See* 7 C.F.R. § 1980.175 (indicating that "[t]he basic objective of the guaranteed OL ..., [or operating] loan, program is to provide credit for family farmers....").

The Conditional Commitment and the Contract of Guarantee also reflect the intention of the parties to benefit plaintiffs specifically. Both of these documents identify plaintiffs as the borrower of the guaranteed funds. *See* E. Allen Farnsworth, *Farnsworth on Contracts* § 10.3 (1990) (noting that "failure of the contract to identify the beneficiary may suggest that the beneficiary is only incidental...."). In addition, the Conditional Commitment included various conditions to which both the borrower and lender had to agree and satisfy before the FmHA would issue the Contract of Guarantee. Mr. Schuerman admitted that he had "reviewed the Conditional Commitment for Contract of Guarant[ee], agreed to accept the terms.... and authorized PCA to accept the Conditional Commitment on ... [his] behalf." Schuerman Decl. ¶ 3.

Based on the regulations, the contracting instruments, and the admissions of defendant in the pleadings, the court holds that plaintiffs have appropriately demonstrated that they qualify as third party beneficiaries to the Contract of Guarantee. This is not a case where the Government entered into a contract for the benefit of the public at large and where two members of the public seeks to sue for breach of contract. Instead, this is a case where the Government specifically identified plaintiffs as the intended beneficiaries in the Contract of Guarantee, and it is upon this contract that plaintiffs are suing for breach. Moreover, the Government required plaintiffs to satisfy various requirements before the Government approved the guarantee, including surviving the local FmHA County Committee's eligibility evaluation. Plaintiffs, therefore, qualify as direct beneficiaries to the Contract of Guarantee, as

---

824 (1955). This court is not bound by these authorities.

opposed to incidental or indirect beneficiaries.[14]

### 4. *Summary judgment*

 Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Only disputes over material facts, or facts that might significantly affect the outcome of the suit under the governing law, preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). None of the disputed matters implicates material facts.

### 5. *Breach of contract*

Assuming plaintiffs qualify as third-party beneficiaries to the Contract of Guarantee, defendant moves for summary judgment on the grounds that plaintiffs breached the terms of this contract by failing to satisfy certain conditions specified in the Conditional Commitment. Specifically, defendant maintains that plaintiffs breached the requirement, which conditioned the advancement of funds for each year of the three-year guarantee, on whether plaintiffs had paid the installments due on their direct loans. According to defendant, this condition remained in force throughout the term of the Contract of Guarantee. Plaintiffs do not contest that they were in arrears with respect to payments on their direct loans. In fact, plaintiffs admit that they owed in excess of $32,000.00 on their direct loans to the FmHA. Plfs' Br. filed Oct. 19, 1993, ¶ 11.

Plaintiffs attempt to refute defendant's characterization of the situation, arguing instead that the conditions specified in the Conditional Commitment became null and void on the date on which the FmHA executed the Contract of Guarantee. Citing the

Conditional Commitment, plaintiffs note that this "commitment will expire on June 3, 1986 ...," which is the day before the date of issuance of the Contract of Guarantee. Plaintiffs further argue that the FmHA failed to incorporate the conditions and requirements specified in the Conditional Commitment into the Contract of Guarantee and that the conditions no longer controlled the agreement between the parties. Thus, under plaintiffs' theory, the fact that plaintiffs were in arrears with respect to their direct loan obligations was moot because the Conditional Commitment no longer controlled the agreement. Plaintiffs also cite the FmHA governing regulations for the proposition that the conditions included in the Conditional Commitment constitute conditions precedent to the issuance of the Contract of Guarantee. *See* 7 C.F.R. § 1980.60 (stating that condition precedent to the issuance of the Contract of Guarantee is satisfaction of conditions specified in Conditional Commitment).

 The issue is whether the parties intended for the Contract of Guarantee to be subject to the conditions specified in the Conditional Commitment. When interpreting a contract, a court must give reasonable meaning to all parts of the contract, as opposed to adopting an interpretation that would render portions of the contract "useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieve[ ] a weird and whimsical result." *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991) (citation omitted); *see also Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir.1985) (holding that interpretation giving reasonable meaning to all parts of contract shall be endorsed over one that leaves portions meaningless); *Firestone Tire & Rubber Co. v. United States,* 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971) (ruling that

---

**14.** In *Parker,* 879 F.2d at 1366, plaintiffs claimed that they were entitled to certain appeal rights because they were third-party beneficiaries to the Lender's Agreement. The court rejected this claim because of a lack of privity of contract. The Lender's Agreement, entered into only by the lender and the FmHA, outlines the lender's duties and responsibilities for all contract(s) of guarantees issued to the lending institution. The document does not refer to any specific borrow-

er. Thus, the *Parker* court denied relief because plaintiffs failed to establish that the provisions of the Lender's Agreement were intended for plaintiffs' specific benefit. *Parker* bears no relevance to plaintiffs' claim in the case at bar because plaintiffs' third-party beneficiary claim is based on the Contract of Guarantee, not the Lender's Agreement. The Contract of Guarantee specifically identifies plaintiffs as the borrower in the instant case.

intention of contracting parties controls contract's interpretation). Moreover, the specific provisions of a contract "must be so construed as to effectuate its spirit and purpose." *Gould*, 935 F.2d at 1274.

Although inartfully drafted, the Contract of Guarantee, in its full faith and credit clause, incorporates the Conditional Commitment by reference. The contract specifically states that "[a]ny losses occasioned will be unenforceable to the extent that loan funds are used for purposes other than those specifically approved by FmHA in its *Conditional Commitment for [sic] Guarantee....*" (Emphasis added.) Plaintiffs argue that this reference to the Conditional Commitment applies only to the purpose, not the conditions, of the loan, as set forth in the Conditional Commitment. Because a contract must be interpreted "so ... as to effectuate its spirit and purpose," the court cannot adopt plaintiffs' interpretation because to do so would yield "a weird and whimsical result." *Gould*, 935 F.2d at 1274.

The FmHA agreed to guarantee plaintiffs' request for a loan based on plaintiffs' professed financial ability to repay the loan. Concerned about plaintiffs' continued financial viability, the FmHA guaranteed the loans subject to certain conditions. For example, the Conditional Commitment stipulated that the "[l]ine of credit balance ... be reduced to $10 plus the amount of inventory on hand that is to be used to pay on the balance *each year*, ... [that] [t]he FmHA installments ... be paid *each year prior to advancing for the next year's crop[.]*," and that the loan payments be applied in a specific order. (Emphasis added.)

The terms of the conditions are prospective in nature. The FmHA carefully drafted these conditions; the intention is manifest that the requirements be a continuing obligation throughout the term of the guarantee. To hold otherwise would render the phrase "for each year" superfluous. Moreover, the FmHA included such conditions to guard against the situation where the FmHA may

find itself guaranteeing loans to a financially insolvent farmer. Plaintiffs and PCA also both agreed to the terms and conditions contained in the Conditional Commitment with the understanding that the operating line of credit would be based upon a three-year guarantee cycle. *See* Schuerman Decl. ¶ 3. To construe the reference to the Conditional Commitment contained in the Contract of Guarantee narrowly to apply only to the purposes set forth in the Conditional Commitment would undermine the fundamental rationale of the guarantee agreement, because the FmHA only guaranteed the loan subject to the condition that plaintiffs remain financially solvent and current on their installment payments under the FmHA direct loan program.

The language of the Conditional Commitment also supports a broad interpretation of the reference to the Commitment contained in the Contract of Guarantee. The Conditional Commitment states that "[o]nce this instrument is executed and returned to FmHA, no major change of *conditions or approved loan purpose* as listed on the Request for Guarantee will be considered." This language explicitly links the conditions and purpose of the loan guarantee. *See* Contract of Guarantee (stating "loan funds ... [must not be] used for purposes other than those specifically approved by FmHA in its Conditional Commitment for [sic] Guarantee...."). Furthermore, such a broad interpretation is supported by the fact that the Contract of Guarantee does not contain certain critical information regarding the terms of the guarantee, such as the interest rate for the loan and the order of priority for which payments on the loan should be applied. Only the Conditional Commitment discusses these important loan term provisions. These omissions further indicate that the parties intended that the Conditional Commitment, and the requirements contained therein, not be read out of existence once the FmHA executed the Contract of Guarantee.[15]

---

15. In addition, the caption appearing at the bottom of the Conditional Commitment reads: "[t]his form may contain certain specific conditions which may require the providing of future reports and information which would have to be

agreed to by the lender and proposed borrower in order to obtain the benefit of potentially acquiring an FmHA loan line of credit guarantee...." This passage further reflects that the parties intended that the requirements specified

Plaintiffs argue that the FmHA expressly incorporated the terms of the Lender's Agreement into the Contract of Guarantee and that had it sought to bind plaintiffs to the conditions specified in the Conditional Commitment, it could have incorporated a reference to that document in the Contract of Guarantee. Plaintiffs misconstrue the FmHA's typewritten insert referencing the Lender's Agreement. The insert states "[t]his Contract for Guarantee [sic] is issued under the Lender's Agreement for Operating Line of Credit Guarantee dated October 28, 1985." The FmHA has no authority to guarantee funds to lending institutions that do not have Lender's Agreements with the FmHA. Thus, the reference to the Lender's Agreement simply explains the authority under which FmHA is acting with respect to the guaranteed loan. *See* 7 C.F.R. § 1980.-61; FmHA Instruction 1980–B (Oct. 7, 1985) (stating lender is approved for processing Contracts of Guarantee).

In addition, defendant's reference to the Lender's Agreement in the Contract of Guarantee sheds light on whether the parties intended to be bound by the conditions in the Conditional Commitment after the issuance of the Contract of Guarantee. For example, the Lender's Agreement requires that the Lender must "obtain[ ] compliance with the covenants and provisions in the line of credit agreement, ... security instruments, and *any supplemental agreements* and notify[ ] both FmHA and the Borrower in writing of any violations." (Emphasis added.) The term "supplemental agreements" may be construed broadly to include all relevant contractual documents pertaining to the guarantee, including the Conditional Commitment. In the letter dated June 16, 1987, PCA properly complied with these requirements in the Lender's Agreement by informing plaintiffs of the FmHA direct loan delinquency, which was a direct violation of a condition in the Conditional Commitment, an agreement pertinent to the guarantee.

The Lender's Agreement also provides that "insurance loss payments, condemnation awards, or similar proceeds are applied on debts *in accordance with lien priorities on*

in the Conditional Commitment be a continuing

*which the guarantee was based....*" (Emphasis added.) Again, the lien priorities in this case were set forth only in the Conditional Commitment. This further supports the notion that the parties intended that the conditions specified in the Conditional Commitment apply to the Contract of Guarantee. To hold otherwise would render portions of the Contract of Guarantee and Lender's Agreement meaningless.

Finally, the conditions of the Contract of Guarantee refer only to the lender's obligations under the contract. In contrast, the Conditional Commitment sets forth conditions of the loan guarantee to which both the borrower and lender were required to agree. Because the FmHA guaranteed the money according to the specific prospective conditions listed above, the court cannot accept that these conditions became irrelevant upon the execution of the Contract of Guarantee, which is primarily designed to address the lender's responsibilities regarding issues such as loan servicing and guarantee termination.

As defendant notes, the Conditional Commitment also supports an interpretation that the conditions contained therein were intended by the parties to apply to the Contract of Guarantee. The Conditional Commitment states that "the ... FmHA ... will execute Form FmHA 1980–27, 'Contract of Guarantee (Line of Credit),' *subject to the conditions and requirements specified in said regulations and below.*" (Emphasis added.); *see also Conditional Commitment* (specifying that the "agreement becomes null and void *unless the conditions are accepted by the Lender and Borrower....*)" (Emphasis added.) Relying upon the regulations, plaintiffs emphasize that these conditions were only conditions precedent to the issuance of the Contract of Guarantee. Although the regulations specify that issuance of the Contract of Guarantee rests upon whether the borrower has met the conditions in the Conditional Commitment, this does not mean that the conditions no longer apply. *See Union Bank & Trust Co. v. United States,* 27 Fed.Cl. 403, 403–04 (1992), *aff'd mem,* 6 F.3d 788 (Fed.Cir.1993) (upholding FmHA denial

obligation.

of lender's loss claim on guaranteed loan because lender violated condition of the Conditional Commitment, which specified certain loan payment priority). Instead, it signifies that the FmHA will not issue the Contract of Guarantee, until the conditions at least have been met initially.

The correspondence between the parties also reflects a common understanding that the conditions included in the Conditional Commitment applied throughout the term of the three-year guarantee. For example, in a letter dated February 27, 1987, from PCA to the FmHA, PCA stated that plaintiffs were "in compliance with PCA loan # 1, which was year one of a three year line of credit operating loan ..., said loan guaranteed ... *according to the conditional commitment for contract of guarantee.*" (Emphasis added.) In this letter PCA indicated that plaintiffs were past due on their FmHA direct loan payments. PCA therefore requested that the FmHA "send ... a copy of the terms for loan servicing as ... [it] need[ed] to comply with th[e outstanding] payment being settled prior to considering advancing on the 1987 line of credit guarantee."

The record reflects that the conditions in the Conditional Commitment remained in effect and that the parties intended them to apply to the Contract of Guarantee. The court construes the reference to the Conditional Commitment in the Contract of Guarantee broadly to incorporate all conditions, including the condition requiring plaintiffs to make the necessary installments on their direct loans prior to the lender, PCA, advancing funds for the next guarantee year. Plaintiffs concede that they were in arrears with respect to their direct loan payments; therefore, they breached this condition of the contract.

### 6. *Waiver*

Plaintiffs argue that even if the conditions specified in the Conditional Commitment applied to the Contract of Guarantee, the FmHA waived those conditions. In particular, plaintiffs maintain that defendant waived all conditions in the Conditional Commitment by insisting that plaintiffs complete the Form 1962–1 as a precondition of the guaranteed

loan. Plaintiffs cite an April 6, 1987 letter, which they received from the FmHA, stating that "no money will be advanced under the Guarantee Line of Credit from PCA without your cooperation regarding the Farm and Home Plan and 1962–1...." Plaintiffs construe this letter as an adverse action within the meaning of the regulations and further maintain that this action constituted a breach of the Contract of Guarantee because the FmHA improperly denied guaranteed funds based on the condition of signing a form, a condition which was absent from the original guarantee conditions.

Plaintiffs further charge that the FmHA attempted to force plaintiffs to sign an invalid Form 1962–1. The administrative appeals determination concerning the disputed Form 1962–1 indicated that plaintiffs refused to sign the form because such form included an ASCS advance deficiency payment, which was not proper collateral. Focusing on the April 6 letter discussing the Form 1962–1, plaintiffs also ask the court to hypothesize that the FmHA could have sent a letter which stated, in effect, that the FmHA will not guarantee funds due to current direct loan delinquencies, had this been the real rationale underlying the denial of the guarantee. Defendant disputes plaintiffs' contention, arguing that the FmHA did not initiate any adverse action against plaintiffs. Defendant also maintains that PCA initiated the action to terminate the guarantee based solely upon plaintiffs' direct loan deficiencies, not upon the failure to sign Form 1962–1.

The record amply reflects both the basis for the termination decision and the fact that it was PCA, not the FmHA, that terminated the agreement. As early as February 20, 1987, PCA expressed concern to the FmHA over plaintiffs' direct loan delinquencies. At that time PCA requested a copy of the arrangements made by the FmHA, with plaintiffs concerning these deficiencies. Such information was necessary because, as PCA noted in the February 20 letter, "[W]e need to comply with that payment ... [and ensure that it is] settled prior to *considering* advancing on the 1987 line of credit guarantee." (Emphasis added.) The importance of this letter is twofold. First, the letter, which

precedes the April 6 letter, identifies the specific condition that plaintiffs violated. This condition was listed as condition # 9 in the Conditional Commitment. Second, the letter indicates the authority of PCA to discontinue loan guarantee payments. *See* 7 C.F.R. § 1980.68 (stating that Lender may request to terminate Contract of Guarantee "for any reason"). Thus, beginning in February 1987 PCA recognized a violation of the Conditional Commitment. Plaintiffs were aware of this violation as early as February because PCA sent them a copy of the letter.

As defendant properly notes, the April 6, 1987 letter does not by itself constitute an adverse action sufficient to terminate the Contract of Guarantee. The FmHA was required to provide notice of appeal rights only if it initiated a formal termination. According to the declaration of Mr. Shelstad dated November 2, 1993, once a decision to terminate a Contract of Guarantee is made, the FmHA, at a minimum, must send a letter to the County Supervisor, lender, and borrower which outlines the reasons for the withdrawal and provides notification of appeal rights. *See* 7 C.F.R. § 1900.53; part 1900, Exhibit B–1 (1993). Plaintiffs have failed to produce any such letters. Instead, plaintiffs make only bare assertions that because of the April 6 letter, the FmHA consequently terminated the agreement. In fact, the record reflects a contrary conclusion. For example, the correspondence dated June 16, and July 2, 1987, both of which mention the direct loan delinquency, discuss the loan guarantee as if it were still in existence. These letters illustrate a continuing attempt to work with plaintiffs to provide disbursement of the 1987 guaranteed funds.

Finally, PCA notified the FmHA of loan termination by way of the Guaranteed Loan Status Report, Form 1980–41, dated January 1, 1989, which provides that the "[l]oan was closed.... [d]ue to lack of repayment." This language is unambiguous and defines the reasons for termination. Based on the current record, the court declines to entertain plaintiffs' hypothesis that the FmHA breached the contract by relying on a condition, such as signing the Form 1962–1, not specified in the original agreement.

## CONCLUSION

Accordingly, based on the foregoing, defendant's motion to dismiss for lack of jurisdiction is denied, defendant's cross-motion for summary judgment is granted, and plaintiffs' motion for partial summary judgment is denied. The Clerk of the Court shall enter judgment dismissing the complaint.

**IT IS SO ORDERED.**

No costs.