Miriam **SABETA, et al., Plaintiffs**

v.

**BAPTIST HOSPITAL OF MIAMI, INC., et al., Defendants**

**No. 04–21437CIV–JORDAN.**

United States District Court,
S.D. Florida.
Miami Division.

Feb. 23, 2005.

Miguel Manuel de la O, Miami, Richard F. Scruggs, Richard F. Scruggs Law Firm, Oxford, MS, Bryan Anthony Vroon, John W Crongeyer, Vroon & Crongeyer, Atlanta, GA, for Miriam Sabeta, Barbara Colomar, On behalf of themselves and all others similarly situated, plaintiffs.

Teresa Ragatz, Eric David Isicoff, Evan Roberts, Isicoff Ragatz & Koenigsberg, Miami, Edward C. Crooke, Christopher R. Zaetta, Mitchell E. Zamoff, Catherine E. Stetson, Hogan & Hartson, Washington, DC, Ty Cobb, Hogan & Hartson, Denver, CO, for Baptist Hospital of Miami, Inc., Baptist Health South Florida, Inc., John Does, 1 through 10, American Hospital Association, defendants.

## ORDER ON MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT

JORDAN, District J.

### I. INTRODUCTION

On June 16, 2004, Miriam Sabeta and Barbara Colomar filed this civil action against Baptist Hospital of Miami, Inc., Baptist Health South Florida, Inc. (collectively referred to as "Baptist"), and John Does 1 through 10. On July 26, 2004, the plaintiffs filed their first amended complaint [D.E. 18], adding as a defendant the American Hospital Association ("AHA"). At the heart of the plaintiffs' amended complaint is their allegation that, as uninsured and indigent patients, they were charged a higher rate for medical care and services than is charged to patients with private insurance or those covered by Medicare or Medicaid. They challenge the defendants' policies for billing and collections from uninsured and indigent patients, and the excessively aggressive tactics used to collect on unpaid bills. The plaintiffs assert the following claims in the amended complaint, listed by count number: (1) a third-party beneficiary claim against Baptist for breach of Baptist's contract with the United States government, the State of Florida, and local governments, under 26 U.S.C. § 501(c)(3); (2) a claim against Baptist for breach of the contract between Baptist and the plaintiffs; (3) a claim against Baptist for breach of duty of good faith and fair dealing; (4) a claim against Baptist for breach of a charitable trust created by the acceptance of federal, state, and local tax exemptions under 26 U.S.C. § 501(c)(3); (5) a claim against Baptist for violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201–213; (6) a claim against Baptist for violations of the Florida Not For Profit Act;[1] (7) a claim against Baptist for violations of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395 dd; (8) a claim against Baptist for unjust enrichment/constructive trust; (9) a claim against both AHA and Baptist for civil conspiracy/concert of action; (10) a claim against the AHA for aiding and abetting Baptist, among other things, in its breach of contract, unjust enrichment, and violations of the FDUTPA, the FDCPA, 42

---

1. Though not cited in the complaint, I assume the plaintiffs are referring to Fla. Stat. § 617.2002, which is part of the Florida Not For Profit Corporation Act. *See* Fla. Stat. § 617.01011 et seq.

U.S.C. § 1983, and the Fourteenth and Fifteenth Amendments of the United States Constitution; (11) a claim against Baptist for violations of the Federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692a(5); (12) a claim against Baptist for violations of 42 U.S.C. § 1983 and the Fourteenth and Fifteenth Amendments of the United States Constitution; and (13)[2] a claim against Baptist for injunctive and declaratory relief under Fed.R.Civ.P. 23(b)(2).

Currently pending are: (1) Baptist's motion for partial summary judgment [D.E. 25] as to Count 7; (2) Baptist's motion to dismiss the first amended complaint [D.E. 26]; and (3) the AHA's motion to dismiss the first amended complaint [D.E. 53].[3] For the reasons stated below, these motions are all GRANTED as to Counts 1, 3, 4, 7, 8, and 12, the claims over which the court has purported original federal jurisdiction pursuant to 26 U.S.C. § 501(c)(3) and/or 28 U.S.C. § 1331. Additionally, Count 11 is DISMISSED WITHOUT PREJUDICE, and the plaintiffs' request for leave to amend Count 11 is GRANTED. Counts 10 and 13, the deriva-

tive claims, are likewise DISMISSED. The remaining state law claims—Counts 2, 5, 6, and 9—are DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1367(c)(3), as I decline to exercise supplemental jurisdiction.

## II. RELATED LITIGATION

This lawsuit is one of dozens of almost identical lawsuits filed in district courts across the country on behalf of uninsured and indigent patients. In October of 2004, the Judicial Panel on Multidistrict Litigation rejected a motion to transfer and consolidate the pending actions into one combined action. *In re Not–For–Profit Hospitals/Uninsured Patients Litigation*, 341 F.Supp.2d 1354 (J.P.M.L. 2004). Several of the cases have been withdrawn prior to a ruling on defense motions.[4] In most of the other cases, the district courts have granted the defendants' motions to dismiss.[5] Although I have analyzed this specific case on its own merits, I have adopted the persuasive reasoning from some of the other dismissals.

---

2. In the first amended complaint, Count 13 is incorrectly labeled as a second Count 12.

3. The AHA adopts Baptist's motion to dismiss in its entirety, and further argues for dismissal of the counts in which it is named, Counts 9 and 10.

4. *See, e.g., Shipman v. Inova Health Care Services*, Case No. 1:04–CV910 (E.D.Va. filed Aug. 6, 2004); *Woodrum v. Integris Health, Inc.*, 2004 WL 3397808 (W.D.Okla.2004); *Kelly v. Northeast Georgia Med. Ctr.*, No. 2:04–CV00139–WCD, 2004 WL 1792449 (N.D.Ga., filed July 21, 2004); *Frimpong v. DeKalb Med. Ctr.*, Case No. 1:04–CV01745–WCO, 2004 WL 2693576 (N.D.Ga., filed July 16, 2004); *Maldonado v. Ochsner Clinic Fdn.*, Case No. 04–CV–1987, 2004 WL 2887748 (E.D.La., filed July 15, 2004).

5. *See, e.g., Hagedorn v. St. Thomas Hospital, Inc.*, Case No. 3:04–0526 (M.D.Tenn. Feb. 7, 2005); *Peterson v. Fairview Health Services,*

Case No. 04–2973 ADM/ABJ, 2005 WL 226168 (D.Minn. Feb. 1, 2005); *Daly v. Baptist Health*, Case No. 4:04CV789GH (E.D.Ark. Jan. 31, 2005); *Hogland v. Athens Regional Health Services, Inc.*, Case No. 3:04–CV–50 (M.D.Ga. Jan. 21, 2005); *Shriner v. ProMedica Health System, Inc.*, Case No. 3:04CV7435, 2005 WL 139128, 2005 U.S. Dist. LEXIS 894 (N.D.Ohio Jan. 21, 2005); *Washington v. Medical Center of Central Georgia*, Case No. 5:04–cv–185 (CAR) (M.D.Ga. Jan. 21, 2005); *Hudson v. Central Georgia Health Services*, Case No. 5:04CV301 (DF) (M.D. Ga. Jan 13, 2005); *Lorens v. Catholic Healthcare Partners*, Case No. 04CV1151, 2004 WL 3145774 (N.D.Ohio Jan. 13, 2004); *Ferguson v. Centura Health Corp.*, 358 F.Supp.2d 1014 (D.Colo.2004); *Burton v. William Beaumont Hosp.*, 347 F.Supp.2d 486 (E.D.Mich.2004); *Darr v. Sutter Health*, Case No. C04–02624 WHA, 2004 WL 2873068 (N.D.Ca. Nov. 30, 2004); *Amato v. UPMC*, 371 F.Supp.2d 752 (W.D.Pa.2004); *Kizzire v. Baptist Health Systems, Inc.*, 343 F.Supp.2d 1074 (N.D.Ala.2004).

## III. FACTS[6]

Baptist Health South Florida, Inc. is a not for profit corporation and the parent of the largest system of hospitals serving South Florida. *See* First Amended Complaint at ¶ 43. Baptist Hospital of Miami, Inc., also a not for profit corporation, is one of five hospitals under the Baptist umbrella.[7] As not for profit institutions, the Baptist health care facilities qualify for federal tax-exempt status under § 501(c)(3) of the Internal Revenue Code. *See id.* at ¶ 40, 46. The American Hospital Association ("AHA") is the national trade association for the nonprofit hospital industry based in Chicago, Illinois. *See id.* at ¶ 38. The plaintiffs, Mss. Sabeta and Colomar, are Florida residents who were treated in Baptist's emergency care department. *See id.* at ¶¶ 35, 36.

Both Ms. Sabeta and Ms. Colomar received medical treatment in Baptist's emergency care department. *See id.* at ¶¶ 62, 70. Neither plaintiff alleges any deficiency in the care she received. *See id.* Both plaintiffs allege that they lacked health insurance at the time of their treatment. *See id.* at ¶¶ 61, 69. When Ms. Sabeta did not pay her bills, Baptist obtained a judgment against her for $7,104.00 on or about November 4, 2002. *See id.* at ¶ 66. Ms. Colomar, on the other hand, reached an agreement with Baptist to pay her obligations of over $10,000 with payments of $50 per month. *See id.* at ¶ 71; Baptist Mot. to Dismiss at 4. Ms. Colomar made payments pursuant to this agreement as recently as the month before she brought this suit. *See* Baptist Mot. to Dismiss at 4.

Ms. Colomar arrived at Baptist's emergency department on March 7, 2003 at 3:10 a.m., complaining of shortness of breath.

Montesino Decl. at ¶ 4a. At 3:20 a.m., she was triaged. *Id.* at ¶ 4c. At that time, Ms. Colomar's respiration was unlabored, her pulse regular, her blood pressure within an acceptable range, and she was not in pain. *Id.* Ms. Colomar told the nurse that she had been discharged from Mercy Hospital earlier that day for the same problem. *Id.* at ¶ 4b. At 3:30 a.m., ten minutes later, Ms. Colomar received medical screening and treatment and was initiated to stabilize her condition. *Id.* at ¶ 4d. The medical screening and treatment rendered to Ms. Colomar in the emergency department was consistent with Baptist's normal practices. *Id.* at 6. During the screening, she received intravenous antibiotics. *Id.* At 3:40 a.m., Ms. Colomar received additional medication and her blood was drawn for testing. *Id.*

According to Baptist's records, Ms. Colomar was registered as a patient at 3:50 a.m., 20 minutes after her medical screening and treatment began. *Id.* at ¶ 4e. Ms. Colomar, however, states that she was "registered" and filled out paperwork *before* she was medically screened and treated. *See* Colomar Aff. at ¶¶ 5–7. The screening process includes asking patients to complete several forms, which can include a guarantee of payment for services not covered by insurance. *See* Montesino Decl. at ¶ 4e. After diligent search, however, Baptist could not locate any payment guarantee signed by Ms. Colomar. *See* Colomar Aff. at ¶ 5. Nevertheless, Ms. Colomar states that she recalls signing a payment guarantee form. *See id.* at ¶ 6.

According to Baptist's records, Baptist last provided treatment to Ms. Sabeta in its emergency department on October 4, 2000. *See* Montesino Decl. at ¶ 6. Ms. Sabeta brought her EMTALA claim

---

6. The facts are taken from the plaintiffs' amended complaint, and from the undisputed facts presented with respect to Baptist's motion for partial summary judgment.

7. For the purposes of this order, both entities collectively are referred to as "Baptist."

against Baptist on June 16, 2004, more than three years later.

The plaintiffs allege that, in a letter from the AHA to the United States Department of Health and Human Services Secretary Tommy Thompson dated December 16, 2003, the AHA admitted that Baptist and other hospital members of the AHA charge their uninsured patients the full price for medical care, and represented that member hospitals were required by federal and state laws to charge and aggressively collect inflated medical expenses. *See* First Am. Compl. at ¶ 126; Ex. A to AHA Mot. to Dismiss.

In an internal memorandum dated December 17, 2003, entitled "Federal Regulations Hamper Hospital Efforts to Assist Patients of Limited Means," the AHA advised Baptist and its other member nonprofit hospitals of the following, as pointed out by the plaintiffs in ¶ 163 of their amended complaint:

> The difficulties created by the Medicare billing rules are related to the practical requirement that each hospital maintain a uniform charge structure that applies to all patients. In other words, each patient must be charged the same amount for identical services. Such uniformity remains crucial to determining payments for some hospitals, such as critical access hospitals, and also to the submission of accurate cost reports for all hospitals.

*See* Ex. B to AHA Mot. to Dismiss at 2.

> [F]ederal and state antikickback laws also contribute to the regulatory confusion. Those laws prohibit hospitals from offering inducements to patients.

*See id.* at 3.

> [H]ospitals must levy uniform charges for all patients to ensure compliance with Medicare cost report requirements.

*See id.* at 5.

> Because of the Medicare rules described above and the lengths to which CMS has

gone to enforce the rules, hospitals continue to believe that the Medicare cost reporting rules require them, in practice, to develop and maintain uniform charges for all patients.

*See id.* at 7.

> State and federal antikickback laws also create incentives for hospitals to aggressively seek repayment from uninsured patients of limited means.

*See id.* at 12.

On June 16, 2004, the plaintiffs brought this action, alleging that Baptist and AHA charge higher prices to uninsured patients than it does to insured patients for comparable services, that Baptist has failed to meet its obligations under § 501(c)(3) to provide emergency room care to uninsured patients without regard to ability to pay, to provide affordable medical care to all of its patients, and not to pursue outstanding medical debts from its uninsured patients.

## IV. STANDARD OF REVIEW

In ruling on a motion to dismiss, I must accept as true all material facts alleged in the amended complaint and construe all reasonable inferences in the light most favorable to the plaintiffs. *See Kirby v. Siegelman*, 195 F.3d 1285, 1289 (11th Cir. 1999) (per curiam). Dismissal is appropriate under Rule 12(b)(6) only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). If the facts alleged in the amended complaint would allow the plaintiffs to recover under any possible theory, the motion must be denied. *See Linder v. Portocarrero*, 963 F.2d 332, 336 (11th Cir.1992).

Summary judgment, on the other hand, "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. P.56(c). A material fact is one that might affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark Inc.*, 929 F.2d 604 (11th Cir.1991). Once the moving party has met its burden, the burden of production shifts to the non-moving party "to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. (quoting Fed.R.Civ.P. 56). Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Hilburn v. Murata Elecs. North Am., Inc.*, 181 F.3d 1220, 1225 (11th Cir.1999). The nonmoving party must demonstrate more than a mere scintilla of evidence; if the nonmoving party's evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–52, 106 S.Ct. 2505. In ruling on a motion for summary judgment, the court "must view the evidence presented through the prism of the substantive evidentiary burden" each party will bear at trial. *Id.* at 252, 106 S.Ct. 2505.

## V. ANALYSIS

### A. COUNTS 1 AND 4

Counts 1 and 4 are both based upon the premise that Baptist's status as a registered tax-exempt charitable entity under 26 U.S.C. § 501(c)(3) gives rise to a contract with the United States (Count 1), and a charitable trust to the plaintiffs (Count 4).

In Count 1, the plaintiffs contend they are third-party beneficiaries to an express or implied contract between Baptist and the United States government, under which the government granted Baptist tax-exempt status under § 501(c)(3), in exchange for Baptist agreeing to operate for charitable purposes and to provide mutually affordable medical care to uninsured patients without regard to its patients' ability to pay for such care. Claiming that Baptist breached its contract with the United States, the plaintiffs insist they did not receive the benefit of that agreement.

### 1. EXISTENCE OF A CONTRACT

First, I must determine whether there exists an express or implied contract between Baptist and any government entities under § 501(c)(3). For the reasons that follow, I find that no such contract exists.

The United States Supreme Court has held:

> [A]bsent some clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights ... This well established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state.

*National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Railway Co.*, 470 U.S. 451, 466, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985) (internal citation omitted). Here, the statute at issue, § 501(c)(3), contains no language indicating that Congress intended to create contract rights inuring to any citizen. Furthermore, the plaintiffs

have not cited, nor have I found, any case in which a court held that a not-for-profit organization enters into a contract with the United States when it qualifies for tax-exempt status under § 501(c)(3). Rather, that statute merely identifies organizations which are exempt from federal income taxes. *See* 26 U.S.C. §§ 501(a) and 501(c)(3). The Tax Code permits the Internal Revenue Service to pursue civil actions against tax exempt organizations that contravene their tax exempt status, so as to collect back taxes or revoke and entity's tax-exempt designation. *See* 26 U.S.C. § 7428.

Nevertheless, the plaintiffs respond by analogizing § 501(c)(3) to the Hill–Burton Act, 42 U.S.C. § 291c. The Hill–Burton Act granted federal funds to states for assistance in the construction and modernization of hospitals and other medical facilities. Under the program, a hospital applying for funds must, among other things, agree to provide "a reasonable volume of services to persons unable to pay therefor ..." *See* 42 U.S.C. § 291c(e)(2). The plaintiffs point out that some courts have held that hospitals which applied for and accepted Hill–Burton funds were contractually obligated to provide charity care to uninsured patients and that third-party beneficiaries of these contracts could bring actions to enforce the contracts. *See* Plaintiffs' Supplemental Brief at 1–6; Opp. to Mot. to Dismiss at 9, 12. *See also, e.g., Flagstaff v. Sullivan,* 962 F.2d 879, 890 (9th Cir.1992) (patients eligible for uncompensated care under the Hill–Burton Act had standing to sue hospital for its failure to provide such care as third party beneficiaries to contract); *Saine v. Hospital Authority of Hall County,* 502 F.2d 1033, 1034–35 (5th Cir.1974) (indigent class had implied authorization to sue non-conforming hospital under Hill–Burton Act).

The Hill–Burton Act, however, is different from § 501(c)(3) in several significant ways. For one, the Hill–Burton Act requires applicant to sign a "Memorandum of Agreement" expressly conditioning the grant of federal monies on the hospital's promise to provide "a reasonable volume of services to persons unable to pay therefor." *See Euresti v. Stenner,* 458 F.2d 1115, 1118–19 (10th Cir.1972). Here, § 501(c)(3) contains no such language and the IRS does nor require organizations to enter into any express contractual agreement before receiving tax-exempt status. Moreover, the Hill–Burton Act provides direct funds, while § 501(c)(3) provides tax-exemptions. Finally, the Hill–Burton Act includes an express private cause of action to enforce the Act, whereas § 501(c)(3) does not provide for a private right of action. Thus, § 501(c)(3) is not analogous to Hill–Burton and does not create a contract between the federal government and a tax-exempt hospital. Therefore, any claims relying on § 501(c)(3) creating a contractual relationship are dismissed with prejudice for failure to state a claim upon which relief can be granted.

### 2. STANDING

Even if § 501(c)(3) did create a contract between Baptist and the United States government—which it does not—the plaintiffs do not have standing to sue because they are not third-party beneficiaries of such an agreement, and do not have an implied private right of action.

#### a. THIRD PARTY BENEFICIARY

In arguing that they are the third-party beneficiaries of the alleged contract between Baptist and the government, the plaintiffs rely on *Montana v. United States,* 124 F.3d 1269, 1273 (Fed.Cir.1997), for the proposition that "the intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class intended to benefited thereby." *See* Opp. to Mot. to Dismiss at 11. However, the Federal Circuit's holding applied to Montana, a state, and not to private members of the general public:

"[W]hen members of the public bring suit against promisors who contract with the government to render a public service ... [they] are considered to be incidental beneficiaries unless they can show a direct right to compensation." *Id.* at n. 6. In other words, members of the general public, as incidental beneficiaries of government contracts, have no right to enforce the contract or seek damages for its breach. *See id.*

The plaintiffs also cite *Schuerman v. United States,* 30 Fed.Cl. 420, 433 (Fed.Cl. 1994), for its statement that "the proper test for determining third-party beneficiary status is whether the contract reflects the express or implied intention of the parties to benefit the third party." *See* Opp. to Mot. to Dismiss at 10–11. The *Schuerman* court was careful to "distinguish between incidental and indirect beneficiaries and direct beneficiaries, only the latter of which qualifies for third-party beneficiary status." *See id.* In finding that the plaintiffs were direct, third-party beneficiaries, the court reasoned:

> This was not the case where the Government entered into a contract for the benefit of the public at large and where two members of the public seek[ ] to sue for breach of contract. Instead, this is a case where the Government specifically identified plaintiffs as the intended beneficiaries in the Contract of Guarantee, and it is upon this contract plaintiffs are suing for breach.

*Id.* The court held that the plaintiffs were direct beneficiaries because they were specifically identified in the "Contract of Guarantee" as "borrowers of the guaranteed funds." *See id.*

Under the reasoning in *Schuerman,* the plaintiffs here are nothing more than incidental beneficiaries because they are only two members of a large segment of the public attempting to sue on the alleged contract. I conclude that event if a contract exists, the plaintiffs' status as "indigent" and "uninsured" patients is not sufficiently specific to qualify them as intended beneficiaries.

The plaintiffs are unable to cite any provision of § 501(c)(3) or the tax code which states or implies that the uninsured have a direct right to compensation under the statute or to support the plaintiffs' statement that "uninsured medically indigent patients are the specific intended beneficiaries of Baptist's agreement with the federal government ..." *See* Opp. to Mot. to Dismiss at 11. In fact, IRS Rev. Rul. 69–545, 1969 WL 19168, upon which the plaintiffs partially rely, actually suggests that the plaintiffs have no right of action because a hospital can maintain its charitable status even if it does not treat indigent patients.[8] Moreover, the tax code clearly limits the parties in any § 501(c)(3) controversy to the IRS and the entity whose status is in issue. *See* 26 U.S.C. §§ 7401, 7428.[9] Thus, the plaintiffs are

---

**8.** Rev. Rul. 69–545 states: "The promotion of health, like the relief of poverty and the advancement of education and religion, is one of the purposes in the general law of charity that is deemed beneficial to the community as a whole even though the class of beneficiaries eligible to receive a direct benefit from its activities does not include all members of the community, such as indigent members of the community, provided that the class is not so small that its relief is not of benefit to the community. Restatement (Second), Trusts,

§ 368, comment (b) and § 372, comments (b) and (c); IV Scott on Trusts (3rd ed.1967), § 368 and § 372.2. By operating an emergency room open to all persons and by providing hospital care for all those persons in the community able to pay the cost thereof either directly or through third party reimbursement, [a hospital] is promoting the health of a class of persons that is broad enough to benefit the community."

**9.** The plaintiffs argue that these sections do not bar the claim for monetary relief in this

not third-party beneficiaries to the purported contract between Baptist and the United States government.

### b. IMPLIED PRIVATE RIGHT OF ACTION

■ As explained above, § 501(c)(3) does not provide an express private right of action. The plaintiffs assert, however, that they have an implied right of action. In support, the plaintiffs cite *Shotz v. City of Plantation,* 344 F.3d 1161, 1168, n. 7 (11th Cir.2003), and *Love v. Delta Air Lines,* 310 F.3d 1347, 1352 (11th Cir.2002). *See* Pl. Suppl. Brief at 4–6. Neither of these cases support the implication of a private right of action in this case.

In *Shotz,* the Eleventh Circuit held that the ADA's retaliation provision[10] contains "*explicit* rights-creating language" because it "specifically identifies a protected class and expressly confers on that class a right not to be retaliated against." 344 F.3d at 1167–68 (emphasis added). Thus, it did not decide the issue of whether the plaintiff had an *implied* right of action.

In *Love,* the Eleventh Circuit reversed the district court's finding that the plaintiff had an implied private right of action under the Air Carrier Access Act ("ACAA"). It held that, in determining whether a statute creates a private right of action, the focus is "exclusively on legislative intent." 310 F.3d at 1351–52. The panel cited *Alexander v. Sandoval,* 532 U.S. 275, 286–87, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), which explained:

> The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. Statutory intent on this latter point is determinative. Without it, a

cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute. Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals.

*Love,* 310 F.3d at 1352.

In this case, the plaintiffs argue that "Congress intended to protect the poor and necessarily confer individual rights upon this specific class of beneficiaries." *See* Suppl. Brief in Opp. to Mot. to Dismiss at 5. But there is no evidence that Congress intended to create a private right. In addition, there clearly is no private remedy, which according to *Alexander* is determinative of whether a cause of action exists. The statute at issue does not describe who may receive the benefits of a § 501(c)(3) organization's activities. Rather, it describes the types of organizations that may seek a particular tax exemption. Moreover, the absence of a private right of action under § 501(c)(3) is noteworthy because Congress has established private rights of action in the Internal Revenue Code for other tax-related matters. *See, e.g.,* 26 U.S.C. §§ 7431(a)(1), 7433. Furthermore, upon thorough review of the legislative history, other courts have determined—and I do as well—that Congress did not intend to create a private right of action. *See, e.g.,* Memorandum Opinion and Order of Dismissal at 3–5, in *Ferguson v. Centura Health Corporation,* 358 F.Supp.2d 1014 (D.Colo.2004).

Because § 501(c)(3) does not establish a contract between the federal government

---

action. *See* Opp. to Mot. to Dismiss at 11–12, n. 13. Yet the plaintiffs have not pointed to any other provision which entitles them to the relief they are requesting.

**10.** The applicable retaliation provision of the ADA states: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter ..." 42 U.S.C. § 12203(a).

and Baptist and does not provide the plaintiffs with an implied cause of action or a right to sue as third-party beneficiaries, Count 1, insofar as it is premised on § 501(c)(3), must be dismissed with prejudice for lack of standing and for failure to state a claim upon which relief can be granted.

### 3. EXISTENCE OF A CHARITABLE TRUST

▇ Count 4 of the complaint alleges that Baptist entered into a "public charitable trust to provide mutually affordable medical care to its uninsured patients" by virtue of its § 501(c)(3) status. *See* First Amended Complaint at ¶ 102. The plaintiffs allege that they are the intended beneficiaries of this alleged charitable trust. Because I have already concluded that the plaintiffs do not have a private right of action to enforce § 501(c)(3), this count likewise fails and must be dismissed.

For several additional reasons, moreover, the plaintiffs have failed to state a claim based upon the existence of a charitable trust. For one, charitable trusts require language demonstrating a specific intent to create the trust. *See* Restatement (Second) of Trusts §§ 348–49. There is no allegation that such specific language anywhere exists. In addition, Chapter 737, Part V, of the Florida Statutes, which concerns charitable trusts, defines a "trust" as "an *express* trust created by a trust instrument, including a will." *See* Fla. Stat. § 737.501(b) (emphasis added). Here, the plaintiffs have failed to allege the existence of any trust instrument, and they cite no case holding that § 501(c)(3) creates a charitable trust. Therefore, I hold that § 501(c)(3) status, in and of itself, is insufficient to show that the

government or Baptist intended to establish a charitable trust for the benefit of certain members of the community. Thus, there is no express charitable trust.

In the alternative, the plaintiffs have also urged me to find the existence of an implied charitable trust. In arguing for an implied trust, the plaintiffs cite *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 29, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), for the following quote: "the term 'charitable' ... as it is used in section 501(c)(3) of the Code contemplates an implied public trust constituted for some public benefit ..." *Id.* (quoting Rev. Rul. 56–185, 1956 WL 11273).[11] The plaintiffs, however, have taken this quote out of context. The use of the word "trust" has nothing to do with the holding or reasoning of the case. The Supreme Court actually held that indigent patients, who were refused treatment at a tax-exempt hospital, lacked standing to bring suit against Treasury officials. *See id.* at 37, 96 S.Ct. 1917. It is true that *Simon* leaves open the question of whether the plaintiffs in that case would have had standing if they had named the hospitals themselves as defendants (as opposed to naming the Treasury officials). *See id.* at 41, 96 S.Ct. 1917. Even so, *Simon* does not mandate or warrant the finding of a charitable trust in the present case.

▇ Even if the plaintiffs were able to establish the existence of a charitable trust and breach, the plaintiffs would not be proper parties to sue for the breach. "The mere fact that a person is a possible beneficiary is not sufficient to entitle him to maintain a suit for the enforcement of a charitable trust." *See* Restatement (Second) of Trusts § 391, Comments (c) and

---

**11.** Significantly, *Simon* acknowledged that Rev. Ruling 56–185 was superseded by Revenue Ruling 69–545, which has no implied charitable trust language, but allows a hospital to maintain its charitable status based on its health services, even though it may not provide free care for indigent patients. *See Simon*, 426 U.S. at 30, 96 S.Ct. 1917; Rev. Rul. 69–545.

(d). "As a general rule, only the Attorney General may enforce a charitable trust." *See id.* at § 391, Comments (a) and (d); *Delaware ex rel. Gebelein v. Fla. First Nat'l Bank of Jacksonville,* 381 So.2d 1075, 1077 (Fla. 1st DCA 1979). The plaintiffs argue that, as medically indigent and uninsured patients, they have a "special interest" in Baptist's charitable trust and may therefore sue to enforce the trust. *See* Opp. to Mot. to dismiss and 20–21. *See also* Restatement (Second) of Trusts § 391, Comment (c) ("Person having a *special interest*... [W]here a charitable trust is created for the relief of poverty ..., it may be provided that particular persons shall be entitled to a preference in receiving benefits under the trust.... In such a case any such person can maintain a suit against the trustees for the enforcement of the trust."). Assuming *arguendo* that the plaintiffs do have a "special interest," the plaintiffs have failed to state a claim based upon an express or implied charitable trust for the reasons previously stated. Thus, Count 4 is dismissed with prejudice.

### B. COUNT 7

Baptist has moved for both dismissal and summary judgment on Count 7 of the amended complaint. In Count 7, the plaintiffs allege that Baptist directly violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, by conditioning medical screening and/or treatment for emergency medical conditions on the plaintiffs' ability to pay and financial guarantees, and refusing to provide emergency medical screening and/or treatment until such guarantees were given. *See* First Amended Complaint at ¶¶ 115–19.

The EMTALA requires a hospital emergency department to screen patients who come to the emergency department, and to stabilize those patients who have emergency medical conditions, regardless of their ability to pay. *See* § 1395dd(a), (b). In addition, the EMTALA prohibits a hospital from delaying medical screening or treatment in order to inquire about the individual's method of payment or insurance status. *See* § 1395dd(h). Moreover, under the EMTALA, "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violations of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate." § 1395dd(d)(2)(A).

### 1. MOTION TO DISMISS COUNT 7

The plaintiffs have alleged that Baptist "would not provide emergency medical screening and/or treatment to the Plaintiffs ... unless they were able to pay for such medical care or until they agreed to sign a form contract guaranteeing payment in full for sum medical care." *See* First Amended Complaint at ¶ 118. Baptist argues that Count 7 should be dismissed because it makes the "unwarranted assumption" that Baptist "would not" provide screening or treatment, based only upon the fact that Baptist gave them forms to complete that included personal payment guarantees. *See* Mot. to Dismiss at 18. Notably, the EMTALA does not forbid a hospital from inquiring into a patient's ability to pay for treatment, so long as its inquiry does not delay screening or treatment. Regulations promulgated by the Department of Health and Human Services concerning a hospital's treatment for emergency medical conditions provide, in part, as follows:

> Hospitals may follow reasonable registration processes for individuals for whom examination or treatment is required by this section, including asking whether an individual is insured and, if so, what that insurance is, *so long as*

*that inquiry does not delay screening or treatment.*

42 C.F.R. § 489.24(d)(4)(iv) (emphasis added).

### a. COMPLAINT ALLEGES DELAY IN SCREENING AND/OR TREATMENT

Although the allegation in Count 7 does not contain the word "delay," it does suggest that screening or treatment could have been delayed by virtue of Baptist's alleged requirement of the plaintiffs to sign the purported contract. While it is true that the plaintiffs do not challenge the quality of treatment received at Baptist, specific inquiries into whether Baptist's alleged registration process actually delayed the plaintiffs' emergency screening and/or treatment is improper at this stage of the litigation because a motion to dismiss merely tests the factual allegations in the complaint (viewed in the light most favorable to the plaintiffs). Any further inquiry is more appropriate at the summary judgment stage.[12] As discussed below, however, Baptist's motion for summary judgment on Count 7 is granted as to Ms.

Colomar because her screening and/or treatment were not delayed.

### b. FAILURE TO ALLEGE PERSONAL HARM

Notwithstanding the allegations of delay, the EMTALA claim fails because the plaintiffs failed to allege that they suffered any personal harm. The plaintiffs alleged merely that they suffered "economic injury and other damages" caused by Baptist's acts. *See* First Amended Complaint at ¶ 119. Under § 1395dd(d)(2)(A), however, only those who suffer "personal harm" as "a direct result of a participating hospital's [EMTALA] violation" may bring a claim against a hospital.[13] Such persons may only "obtain those damages available for personal injury under the law of the State in which the hospital is located." *Id.* The Supreme Court of Florida has made clear the scope of personal injury damages:

> In an action for negligent injury to the person of the plaintiff, he may recover the expenses of his cure, the value of the time lost by him during the cure, and a fair compensation for the physical and mental suffering caused by the injury, as well as for any permanent reduction of

**12.** The same conclusion was reached in *Burton v. William Beaumont Hosp.*, 347 F.Supp.2d 486, 494–97 (E.D.Mich.2004), where Judge Cohn found that a virtually identical EMTALA count stated a claim because it could be read to allege delay. *But see Amato v. UPMC*, 371 F.Supp.2d 752, 758–59 (W.D.Pa.2004), Report and Recommendation by Magistrate Judge Robert C. Mitchell (dismissing an almost identical count in the complaint because delay was not alleged).

**13.** To this, the plaintiffs respond that the EMTALA's personal harm requirements do include economic damages for patients. The plaintiffs argue that the EMTALA does not require medical harm or physical injuries to be actionable because *Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir.1994), held that the EMTALA is not a medical malpractice statute. *See* Opp. Memo to Mot. to Dismiss at 27. *Holcomb*, however, does not lead to such

a conclusion. In *Holcomb*, the plaintiffs had alleged violations of only §§ 1395dd(a) and (b) of the Act, arising from a patient who died as a result of inadequate screening procedures. In the present case, the plaintiffs have not challenged the adequacy of the medical screening. The *Holcomb* panel reasoned that "section 1395dd(a) is not designed to redress a negligent diagnosis by the hospital," and that "no federal malpractice claims are created." *See* 30 F.3d at 117. As a result, the court held that a hospital does not violate this section of the Act "[a]s long as [the] hospital applies the same *screening procedures* to indigent patients which it applies to paying patients." *See id.* (emphasis added). In the present case, the plaintiffs have failed to allege that Baptist screened or treated them differently than it did other non-indigent patients. Thus, *Holcomb* cannot save the plaintiffs' EMTALA claim.

his power to earn money. The damages for personal injuries include, and are limited to, the natural and immediate consequences of the wrongful act. They include irrespective of the defendant's motive or conduct at the time of the injury (1) expenses of surgical and medical attendance and nursing, and (2) bodily pain, taking into account loss of time, the extent and probable duration of the injury, its effect on the health, the mental and physical powers, the capacity for labor, the pursuit of an occupation and the earning of money.

*Florida R. & N. Co. v. Webster,* 25 Fla. 394, 5 So. 714, 720 (1889) (citations omitted).

In light of the Florida Supreme Court's definition of personal injury, the plaintiffs' "economic injury and other damages" are insufficient to state a claim. Even assuming that the plaintiffs have otherwise adequately pled a cause of action under § 1395dd, economic injuries are not "personal injuries" under Florida law and thus not compensable damages under the civil enforcement provision of EMTALA. For the foregoing reasons, Count 7 should be dismissed. It is not clear whether the plaintiffs believe that they could amend their complaint to allege the required personal harm.[14] As explained below, however, even if they were permitted to do so, Baptist would be entitled to summary judgment on the EMTALA claim.

### 2. MOTION FOR SUMMARY JUDGMENT ON COUNT 7

Even if the EMTALA claim were to survive a motion to dismiss—which it does not—or were amended to allege personal harm, Baptist would be entitled to summary judgment on Count 7. That is because, on summary judgment, I can consider matters outside the pleadings in deciding whether there exists a genuine issue of material fact. In its summary judgment motion on Count 7, Baptist argues that: (1) Ms. Sabeta's claim is time-barred; (2) Ms. Colomar received medical screening and treatment without delay; and (3) neither plaintiff suffered actionable personal harm. *See* Baptist Summary Judgment Motion at 10.

#### a. MS. SABETA'S EMTALA CLAIM IS TIME-BARRED

██ To invoke the remedies available under the EMTALA, a plaintiff must act within the two-year statute of limitations set forth in the statute. *See* 42 U.S.C. § 1395dd(d)(2)(C). *See also Vogel v. Linde,* 23 F.3d 78 (4th Cir.1994) (based on statute's plain language, EMTALA claim dismissed as time-barred because complaint was filed two years and ten months after date of alleged violation). It is undisputed that Ms. Sabeta last received medical treatment at Baptist's emergency department on October 4, 2000. *See* Becky Montesino Decl. at ¶ 7, Ex. A to Mot. for Summary Judgment; Sabeta Aff. at ¶¶ 3–6. This case was brought on June 16,

---

**14.** At the January 7, 2005, hearing, the plaintiffs cited Judge Cohn's order in *Burton v. William Beaumont Hosp.,* 347 F.Supp.2d 486, 496–97 (E.D.Mich.2004), to support their request to amend their complaint to allege personal harm, as is required under EMTALA. In *Burton,* Judge Cohn granted the plaintiffs leave to amend to properly plead an EMTALA claim to allege personal harm. As Baptist has pointed out, however, Judge Cohn was not presented with a summary judgment mo-

tion, as I am in this case. Here, it would be futile to grant leave to amend because, as explained below, Baptist is entitled to summary judgment on the EMTALA claim. *See Hall v. United Insurance Co. of America,* 367 F.3d 1255, 1262 (11th Cir.2004) ("Because the district court properly granted summary judgment on this issue, denial of [the plaintiff's] motion to [amend the complaint to] add these two new claims was proper.").

2004, more than three-and-a-half years later. Thus, the record shows that Ms. Sabeta's claim is barred by the EMTALA's two-year statute of limitations.

In response, the plaintiffs argue that because Ms. Sabeta did not discover her personal harm "until shortly before filing [their] complaint," her claims are not time-barred. *See* Opp. to Summary Judgment Mot. at 4. I find this argument to be disingenuous. Even if the plaintiffs' so-called economic injury qualified as compensable personal harm under EMTALA—and I do not believe it does—it is hard to believe that such economic damages were not known to the plaintiffs within the two-year limitations period. Indeed, Ms. Sabeta admits that knew she had been asked to sign payment guarantees on the day she visited the hospital. *See* Sabeta Aff. at ¶¶ 7–12. She knew she had been "delayed" in receiving her medical evaluation and treatment. *See* Opp. to Summary Judgment Mot. at 8. She knew she was not treated without regard to ability to pay. *See id.* Surely Ms. Sabeta knew of her economic injuries well before November of 2002, when Baptist obtained a judgment against her for $7,104.00, the cost of her medical bills. *See id.* at ¶¶ 17–19.

The plaintiffs further argue that because federal courts apply the discovery rule when a statute does not specify when the accrual period begins, the cause of action did not begin accruing until Ms. Sabeta discovered, or should have discovered, her injury. *See* Opp. to Summary Judgment Mot. at 7. The plaintiffs maintain that Ms. Sabeta discovered her injury or personal harm "within the statutory period." *See id.* at 8. Notably, however, the plaintiffs do not point to an event or date when such discovery occurred. Without more, I find that the undisputed evidence demonstrates that any injury was discovered or should have been discovered outside the applicable limitations period.

The plaintiffs also argue that even if the discovery rule does not apply, this court should apply the principles of equitable tolling and equitable estoppel to prevent Baptist from prevailing on its statute of limitations defense. Florida law applies the equitable tolling doctrine in situations where the plaintiff has been lulled into inaction or has in some extraordinary way been prevented from asserting his or her rights. *See Machules v. Dep't of Admin.,* 523 So.2d 1132, 1134 (Fla.1988). The Eleventh Circuit applies a similar standard for equitable tolling, focusing "on the plaintiff's excusable ignorance of limitations period and on [the] lack of prejudice to the defendant." *See Cocke v. Merrill Lynch & Co.,* 817 F.2d 1559, 1561 (11th Cir.1987). *See also Young v. United States,* 535 U.S. 43, 50, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002). ("This Court has permitted equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass.") (internal citations omitted); *Bost v. Fed. Express Corp.,* 372 F.3d 1233, 1242 (11th Cir.2004) ("Although a court may equitably toll a limitations period, the plaintiffs must establish that tolling is warranted. Equitable tolling is inappropriate when a plaintiff did not file an action promptly or failed to act with due diligence. Equitable tolling is an extraordinary remedy which should be extended only sparingly.") (internal citations omitted). In *Cocke,* the court reasoned that equitable tolling was appropriate because the employee in that case could not be expected to sue his employer for age discrimination while "at the same time he is led to believe the employer is trying to place him in another job." *See id.* at 1561–62.

Here, Ms. Sabeta was not lulled into inaction. Baptist never did anything to prevent Ms. Sabeta from bringing her lawsuit or prevent her from realizing that she had suffered (at the very least) economic injury. By her own admission, Baptist "never offered financial assistance during or after her Hospital admission," even though "she asked for this several times." *See* Sabeta Aff. at ¶¶ 15, 17. It should have been clear to Ms. Sabeta that despite her desire for financial assistance, Baptist was not going to provide it. It appears that Ms. Sabeta simply failed to act with due diligence in timely filing her claims. Thus, to apply the extraordinary remedy of equitable tolling would be inappropriate in this case.[15]

Like equitable tolling, the doctrine of equitable estoppel is also inapplicable in this case. Equitable estoppel generally requires: (1) a representation as to a material fact that is contrary to a position subsequently asserted; (2) the plaintiff's reliance on that representation; and (3) a change in position detrimental to the party claiming estoppel, caused by the representation and reliance. *See Sun Cruz Casinos, L.L.C. v. City of Hollywood, Fla.*, 844 So.2d 681 (Fla. 4th DCA 2003). *See also Irvine v. Cargill Investor Servs., Inc.*, 799 F.2d 1461, 1463 (11th Cir.1986). The plaintiffs, however, have not provided any evidence of a definite and specific misrepresentation made by Baptist to Ms. Sabeta. While the plaintiffs have stated that they "trusted" Baptist to provide financial assistance, there is no evidence that Baptist willfully caused Ms. Sabeta to believe that she would receive any such assistance or that she was entitled to receive it.

For the foregoing reasons, neither the discovery rule, equitable tolling, nor equitable estoppel negates a finding that Ms. Sabeta's EMTALA claim is time-barred. Baptist is entitled to summary judgment on Count 7 against Ms. Sabeta.

### b. Ms. Colomar's Screening and/or Treatment Was Not Delayed

As stated previously, registration procedures are permitted under the EMTALA as long as screening and treatment are not "delayed." Count 7 of the plaintiffs' complaint is based on the allegation that Baptist failed to provide emergency medical screening and/or treatment unless Ms. Colomar signed a payment guarantee. Stated differently, in the light most favorable to Ms. Colomar, Baptist delayed its treatment while requiring Ms. Colomar to sign payment guarantees. Ms. Colomar's medical record, however, shows that there was no delay in her care. *See* Ex. A to Motion for Summary Judgment.[16] She arrived at Baptist's emergency department at 3:18 a.m. on March 7, 2003, complaining of shortness of breath. *See* Montesino Decl. at ¶ 4a. Ms. Colomar was then triaged at 3:20 a.m., two minutes after her arrival. *See id.* at ¶ 4c. Ten minutes later, at 3:30 a.m., Ms. Colomar received medical screening and treatment in the form of intravenous antibiotics. *See id.* at ¶ 4d. She was registered as a patient at 3:50 a.m. *See id.* at ¶ 4e. Baptist has no record of Ms. Colomar ever having signed a guarantee of payment. *See id.* at ¶ 5.

The plaintiffs submit Ms. Colomar's affidavit in support of the theory that a delay in treatment occurred. She says that before any doctors or nurses took care of

---

15. At least one federal court has held that, based on the EMTALA's legislative history, the doctrine of equitable tolling is inapplicable to the EMTALA. *See Brewer v. Miami County Hospital*, 862 F.Supp. 305, 307–308 (D.Kan.1994). I do not need to address this issue given my ruling.

16. *See Bauman v. Tenet Healthsystem Hosps., Inc.*, 2002 WL 58486, 2002 U.S. Dist. LEXIS 1300 (E.D.La. Jan. 11, 2002) (finding no delay under EMTALA where patient was screened and/or treated within minutes).

her, she was asked whether or not she had insurance. *See* Colomar Aff. at ¶ 5. Significantly, however, she does not describe how long she waited with any specificity. She also states that Baptist gave her a lot of papers to read over and sign. *See id.* She does not state when this occurred, or how long it took. To defeat a motion for summary judgment, however, "the non-moving party may not rely on 'mere allegations.' It must raise 'significant probative evidence' that would be sufficient for a jury to find for that party." *See LaChance v. Duffy's Draft House, Inc.,* 146 F.3d 832, 835 (11th Cir.1998); *Benton–Volvo–Metairie, Inc. v. Volvo Southwest, Inc.,* 479 F.2d 135, 139 (5th Cir.1973) (recognizing rule in summary judgment context that "affidavits containing mere conclusions have no probative value" (citation omitted)). In addition, "[i]f the factual context makes the non-moving party's claim implausible, then that party must come forward with more persuasive evidence than otherwise would be necessary to show that there is a genuine issue for trial." *Blue Ridge Ins. Co. v. Stanewich,* 142 F.3d 1145, 1147 (9th Cir.1998). Thus, Ms. Colomar's affidavit is insufficient to create a genuine issue of material fact as to whether her treatment and/or screening was delayed. The undisputed evidence shows that it was not.

#### c. THE PLAINTIFFS HAVE SUFFERED NO PERSONAL HARM

Even if the plaintiffs could prove that Baptist delayed Mss. Sabeta's and Colomar's screening or treatment to inquire about payment, it still would be essential that the plaintiffs suffered "personal harm" to succeed on their EMTALA claim. As explained previously in the discussion of the motion to dismiss Count 7, the plaintiffs have neither alleged nor have they shown that they suffered anything other than "economic injury and other damages." Such damages are not recoverable personal injuries under Florida law.

For the foregoing reasons, summary judgment is granted in favor of Baptist and against Ms. Sabeta on Count 7.

### C. COUNTS 9 AND 10—CONSPIRACY AND AIDING AND ABETTING

The plaintiffs allege a claim of civil conspiracy against the AHA for conspiring with Baptist: (1) to charge the plaintiffs the highest undiscounted inflated cost for medical care and aggressively collect such inflated medical debt through abusive lawsuits, liens and garnishments; (2) to wrongfully retain its tax exempt status and breach the § 501(c)(3) contract; (3) to violate the Florida Fair Business Practices Act and Uniform Deceptive Trade Practices Act; and (4) to breach the duty of good faith and fair dealing. *See* First Amended Complaint at ¶¶ 125–129. The plaintiffs also accuse the AHA of aiding and abetting the above acts. *See id.* at ¶¶ 132–141. Because I have held there is no § 501(c)(3) contract, AHA cannot be held liable for conspiracy or aiding and abetting the alleged breach. Insofar as these claims are based on the breach of the alleged § 501(c)(3) contract, they are dismissed with prejudice for failure to state a claim on which relief can be granted. Insofar as these claims are based on allegations of underlying state-law violations, they are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3), as I decline to exercise supplemental jurisdiction.

Because I am dismissing the underlying claims forming the basis for Counts 9 and 10, the plaintiffs' reliance on *Maldonado v. Oschner Clinic Foundation,* Case No. 04–2635, 2004 WL 2888179 (E.D.La. Dec. 6, 2004), is of no avail. *See* Suppl. Brief at 9–10. In *Maldonado,* the court denied the AHA's motion to dismiss similar claims, but it appears from the case that the decision came before the court adjudicated the

underlying claims. I, on the other hand, have dismissed the underlying claims on Baptist's motion, and therefore dismiss the claims against the AHA for conspiracy and aiding and abetting.

### D. COUNT 11—FDCPA

 In Count 11, the plaintiffs allege that Baptist violated the Fair Debt Collection Practices Act ("FDCPA") by its aggressive collection tactics. The FDCPA prohibits a "debt collector" from making false, deceptive or misleading representations when trying to collect a debt.

To be held liable under the FDCPA, Baptist must be a "debt collector," which is defined as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). The statute also extends coverage to "any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts." *See id.*

In their supplemental brief, the plaintiffs have conceded that the first amended complaint contains no allegation that Baptist is a "debt collector," *i.e.,* that it used another name or represented itself as a separate debt collection agency in its attempts to collect on the plaintiffs' bills. *See* Pl. Suppl. Brief at 7. As such, Count 11 should be dismissed. The plaintiffs, however, have requested leave to amend the complaint to include the allegation that Baptist collected its debt using the name of Kendall Credit, which the plaintiffs allege is a "sham. assignee, intended to deceptively distance the hospital from its collections activities." *See id.*

Baptist responds that leave to amend should be denied because Kendall Credit and Business Service, Inc. ("Kendall Credit") is actually a wholly owned subsidiary of Baptist, and is a separate and distinct corporation organized and existing under Florida law. Baptist asserts that if Kendall Credit was the entity that attempted to collect debts owed by the plaintiffs, then Kendall did so under its "true name"—the name under which it is incorporated pursuant to Florida law and by which it is known to the public. *See* Baptist Resp. to Pl. Suppl. Brief at 7 (citing *Orenbuch v. North Shore Health Systems, Inc.,* 250 F.Supp.2d 145, 151–152 (E.D.N.Y.2003), for its holding that: (1) there is nothing misleading about a debt collector (here, Kendall Credit) using the name by which it is known to the public, where that name is a registered trade name with the state (here, Florida), and (2) that it is not a violation of FDCPA when a creditor (here, Baptist) utilizes a separate corporate affiliate (here, Kendall Credit) to collect its debts). Therefore, Baptist argues, no violation of the FDCPA has been stated (or can be stated) against Baptist for its alleged use of Kendall Credit to collect its debts.

While Baptist may ultimately succeed in proving that Kendall Credit is a separate corporate affiliate, I find that dismissing Count 11 with prejudice for failure to state a claim at this stage would be premature. The plaintiffs should be entitled to discovery to determine the accuracy of Baptist's contention that it is not a debt collector. Therefore, the plaintiffs may amend their complaint to allege that Baptist is collecting its debt using the name, Kendall Credit, and that Baptist is engaging activity violative of the FDCPA.

In its motion to dismiss, however, Baptist argues that even if the plaintiffs properly alleged that Baptist was a "debt

collector," they still fail to state a claim because no violation of the Act itself is alleged. Mot. to Dismiss at 26. Baptist asserts that Count 11 does not allege any facts to support a claim that Baptist used deceptive or misleading collection practices. *See id.* Rather, the plaintiffs merely contest the amount of the debt and the accuracy of the transactions which led to the assessment of that amount. *See id.* Baptist suggests that no violation of FDCPA occurred when, as here, Baptist did nothing more than to collect on the amount reflected on its bills.

I conclude, however, that the plaintiffs' allegations are sufficient to allow amendment. The FDCPA lists, without limitation, a wide variety of activities that fall within the purview of the statute. *See, e.g.,* 15 U.S.C. §§ 1692d, 1692e, and 1692f. For example, "a debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt," including "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." *See* 15 U.S.C. § 1692f. The plaintiffs have alleged that at least Ms. Sabeta signed payment guarantees prior to being screened and/or treated at Baptist's emergency room. Thus, the plaintiffs might eventually be able to show, for example, that Baptist unfairly attempted to collect amounts not contemplated in the payment guarantees. The plaintiffs also point out that under the FDCPA, a party cannot falsely represent "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(a). Moreover, ¶¶ 142–151 of the first amended complaint detail Baptist's alleged deceptive acts in collecting inflated charges.

Viewed in the light most favorable to the plaintiffs, Count 11 of the first amended complaint might have stated a claim for violations of the FDCPA had it alleged that Baptist was a debt collector. Thus, as stated previously, the plaintiffs may amend their complaint to allege that Baptist is collecting debt in the name of Kendall Credit, and that as a result, Baptist has violated the FDCPA. Any amended complaint is due by March 4, 2005.

### E. COUNT 12— § 1983

In Count 12 of the first amended complaint, the plaintiffs allege violations of federal constitutional rights under 42 U.S.C. § 1983. This count fails to state a claim under § 1983, because any actions by Baptist were not undertaken under color of state law.

▮ I first address the claim as it is pled. "Section 1983 provides a private right of action whenever an individual has been deprived of any constitutional or statutory federal right under color of state law." *Schwier v. Cox,* 340 F.3d 1284, 1290 (11th Cir.2003). "Only in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes." *Harvey v. Harvey,* 949 F.2d 1127, 1130 (11th Cir.1992). A private party may be held liable as a state actor only if one of the following three conditions is met:

(1) the State has coerced or at least significantly encouraged the action alleged to violate the Constitution ("State compulsion test"); (2) the private parties performed a public function that was traditionally the exclusive prerogative of the State ("public function test"); or (3) "the State had so far insinuated itself into a position of interdependence with the [private parties] that it was a joint participant in the enterprise[ ]" ("nexus/joint action test").

*Rayburn v. Hogue,* 241 F.3d 1341, 1347 (11th Cir.2001) (quoting *NBC, Inc. v. Communications Workers of America,* 860

F.2d 1022, 1026–27 (11th Cir.1988)). The plaintiffs' first amended complaint fails to state a claim under any of the three tests.

 As to the state compulsion test, the plaintiffs do not contend that Baptist's billing practices for uninsured patients were compelled by the government, only that Baptist based its policy upon "perceived requirements" of federal and state laws such as Medicare and Medicaid. The plaintiffs cite no specific provision of any law that mandates Baptist's alleged policy of charging disparate rates for uninsured patients, nor do they alleged any government practice, policy, or command that resulted in those rates.

As to the public function test, Baptist is not performing a function that is traditionally the *exclusive* province of the Government. Traditionally, in the United States the greatest proportion of health care has been provided for by for-profit hospitals, private physicians, churches, and charitable organizations, and have been paid for with private funds or through private health insurance.

As to the nexus/joint action test, the regulations and subsidies related to health care are insufficient to create the necessary "symbiotic relationship" to make Baptist a state actor. *See Rayburn*, 241 F.3d at 1348. That symbiotic relationship must involve "the specific conduct of which the plaintiff complains." *Id.* (quoting *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999)). Courts have repeatedly held that the extensive regulation, subsidies, and tax exemptions "do not transform an otherwise private hospital into a governmental actor." *Mendez v. Belton*, 739 F.2d 15, 18 (1st Cir.1984). *See also Harvey*, 949 F.2d at 1131; *Burton v. William Beaumont Hosp.*, 2004 WL 2790624 (E.D.Mich.2004). In this case, the specific conduct attributed to Baptist arises not from any relationship with the government, but from its own alleged policies. Because the first amended complaint does not allege any action committed under color of state law, then, the plaintiffs cannot maintain an action under § 1983, and Count 12 must be dismissed.

Under any of these tests, Baptist's private behavior cannot be construed as state action. The analysis for finding state action was applied in *Brentwood Academy v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001), where the Supreme Court held that "state action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." In *Brentwood*, the respondent was a not-for-profit corporation organized to regulate interscholastic sport among public and private high schools in the state. *Id.* at 291, 121 S.Ct. 924. In reversing the Sixth Circuit's finding that the defendants were not state actors, the Supreme Court held that the "substantial entwinement" of state actors in the respondent's regulation of state interscholastic sport permitted the petitioner's civil rights action. *See id.* at 302–3, 121 S.Ct. 924. The respondent's functions were accomplished by school officials, primarily from public schools, and the state education board acknowledged the respondent's regulatory authority over school athletics. *See id.* Here, however, the plaintiffs have not alleged that any state actors were "substantially entwined" with Baptist's activities. Thus, there is no indication that Baptist's activities rise to the level of "a largely overlapping identity between an ostensibly private organization and a governmental entity." *See id.* at 303, 121 S.Ct. 924.

 There is an even more fundamental reason why Count 12 fails. The plaintiffs' claim is really based on the theory

that Baptist is acting under color of *federal* law, but § 1983 only reaches conduct under color of *state* law. Thus, Count 12 is really a claim under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), but no such claim exists because the Supreme Court has held that no *Bivens* action lies against a private entity alleged to act unconstitutionally under color of federal law. *See Corr. Servs. Corp. v. Malesko,* 534 U.S. 61, 69–70, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001).

### F. REMAINING STATE LAW CLAIMS

The remaining claims, in Counts 2, 5, 6 and 9, set forth matters of purely state law. Therefore, I decline to continue to exercise supplemental jurisdiction over these claims under 28 U.S.C. 1367(c)(3), which provides:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Furthermore, the Supreme Court has held, "[w]hen the balance of [judicial economy, convenience, fairness and comity] indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only the state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). As explained above, the federal claims in Counts 7, 11[17] and 12, are dismissed. The derivative claims in Counts 10 and 13, are also dismissed. Thus, the plaintiffs' state law claims in Counts 2, 5, 6, and 9 (for breach of contract, violation of duty of good faith and fair dealing, FDUTPA violations, violation of the Florida Not–For–Profit Act, and civil conspiracy), along with any state law claims set forth in Counts 1, 3, 4, and 8, are dismissed without prejudice.

### VI. CONCLUSION

For the foregoing reasons: (1) Baptist's motion for partial summary judgment [D.E. 25] as to Count 7; (2) Baptist's motion to dismiss the first amended complaint [D.E. 26]; and (3) AHA's motion to dismiss the first amended complaint [D.E. 53]; are all GRANTED. Specifically, Counts 1, 3, 4, 8, and 12, inasmuch as they are based on federal law, are DISMISSED WITH PREJUDICE. Counts 10 and 13, the derivative claims, are likewise DISMISSED WITH PREJUDICE. Count 11, also a federal claim, is DISMISSED WITHOUT PREJUDICE, and the plaintiffs' request for leave to amend Count 11 is GRANTED. Summary judgment on the merits is GRANTED in favor of Baptist on Count 7. Counts 2, 5, 6, and 9, the remaining state law claims, are also DISMISSED WITHOUT PREJUDICE to refiling in state court.

If the plaintiffs wish to amend, they must do so by March 11, 2005. For now, this case is CLOSED.

---

**17.** As stated previously, however, I am dismissing without prejudice the federal claim in Count 11 of the complaint concerning Baptist's alleged violations of the FDCPA, while simultaneously granting the plaintiffs' request for leave to amend Count 11. As such, if it turns out that the plaintiffs are able to proceed on an amended FDCPA claim, they then may move that I reconsider the dismissal of their state law claims.

If there is no amendment, a partial final judgment on Count 7 will then be entered, and I reserve jurisdiction for that purpose through March 25, 2005.